[No. A064632. First Dist., Div. Three. Sept. 27, 1995.]

AMERICAN PRESIDENT LINES, LTD., Plaintiff and Respondent, v.
FRANK S. ZOLIN, as Director, etc., Defendant and Appellant.

[No. A067501. First Dist., Div. Three. Sept. 27, 1995.]

AMERICAN PRESIDENT LINES, LTD., Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
FRANK S. ZOLIN, as Director, etc., Real Party in Interest.

## COUNSEL

Daniel E. Lungren, Attorney General, John Newman, Richard F. Finn and Marguerite C. Stricklin, Deputy Attorneys General, and Bernard Lu for Defendant and Appellant and for Real Party in Interest.

Crosby, Heafey, Roach & May, John E. Carne, Ezra Hendon and Jacques B. LeBoeuf for Plaintiff and Respondent and for Petitioner.

No appearance for Respondent Superior Court.

## OPINION

**MERRILL, J.**—American President Lines, Ltd. (APL), paid over $4.2 million in additional fees assessed by the Department of Motor Vehicles (DMV), for registering its fleet of truck trailers during 1989-1991. This appeal and related writ petition question the DMV's determination of those fees and place under scrutiny the procedures for challenging them. We conclude the DMV wrongly assessed additional fees for the years 1989 and 1990, which were covered by a special agreement between the DMV and APL and wrongly computed the fees for 1991, which was outside the special agreement. We affirm the judgment in most respects. We uphold APL's entitlement to prejudgment interest, but we vacate the superior court's determination that APL was entitled to attorney fees.

We also explain why APL was correct in following the administrative mandamus procedures which led to this appeal. We issue a writ of mandate to compel the superior court to terminate a parallel tax refund action instituted by APL at the DMV's insistence.

### I. *Facts and Procedures*

The central issue in this case is the meaning of an agreement entered into by APL and the DMV. To place the agreement in context, we first explain

the International Registration Plan (IRP) and Permanent Interstate Trailer System (PITS) program, to which the agreement relates.

The IRP is a compact entered into by many states and at least one Canadian province to facilitate registration of interstate truck fleets. Under the IRP, a fleet owner selects a base jurisdiction in which to register the fleet. The base jurisdiction issues license plates, tags, and vehicle registrations, calculates the fees owed to each state and province, collects the fees, and disburses them. Fees are apportioned according to the miles traveled in each participating state and province as a percentage of total miles. Trucks registered under the IRP do not have to be separately registered in other participating states or pay trip permit fees for travel in other states, as would trucks registered in the traditional manner.

California is among a handful of states that require registration of both truck cabs (power units) and trailer chassis. California has made the terms and conditions of the IRP applicable to trailer registration[1] and has instituted the PITS program for apportioned registration of fleets of 500 or more commercial interstate chassis.

In 1988, APL operated some 30,000 chassis, 5,000 of them registered in California. In order to reduce the complications involved in purchasing individual trip permits for its non-California chassis, APL entered into discussions with the DMV about joining the PITS program. These discussions uncovered several concerns: (1) APL tracked its chassis by days, not by mileage, because most chassis do not have odometers and errors often occur in driver-noted mileage; (2) it would be administratively difficult to register at once some 30,000 chassis; (3) double registration would be paid in the beginning on those already registered in California; (4) the percentages calculated for the chassis enrolled in the first year would form the basis for fees in the next year, skewing the percentages if the first year enrollees were not representative of the entire fleet.

To meet these problems, the DMV and APL entered into an agreement, the most significant features of which were a 20-month registration period and an agreement to use days in the state in place of miles for computing fees. The appeal and writ filed in this court present conflicting interpretations of this agreement.

The agreement was to take effect May 1, 1989, and to last until 90 days after notice of termination or notice of a desire to alter its terms. APL was to

---

[1]California requires three separate fees: a registration fee, a commercial weight fee, and a license fee. (*O.N.C. Freight Systems* v. *Department of Motor Vehicles* (1983) 149 Cal.App.3d 11, 15-16 [196 Cal.Rptr. 592].) The fees assessed against APL amounted to around $400 per chassis, before apportionment.

make its best effort to finalize enrollment by December 31, 1990. The parties agreed that APL could "use a vehicle day calculation method (inventory) instead of the IRP's standard method of mileage accumulation for reporting jurisdictional percentages." The agreement imposed no specific timetable for submitting enrollment applications. Instead, the agreement stated: "APL will enroll owned and long-term leased chassis in the PITS program. Applications shall be made in quantities to be determined by APL."

The parties agreed, in paragraph C3, that "Vehicle License Fees will be calculated by DMV using the Schedule of Fees for California and other IRP trailer states for the current year, plus indicia and registration fees. Once calculations have been completed for all chassis enrolled in PITS (hereinafter 'Base Fleet Calculation'), fees due to the State of California and other IRP trailer states will be determined as follows: [¶] a) For chassis enrolled during the Enrollment Period: [¶] The Base Fleet Calculation shall be multiplied by the *percentage of the fleet of chassis determined by APL to be eligible for enrollment that are physically located in each trailer state* . . . . [¶] Once Enrollment Period is completed, DMV shall have the option to recalculate fees due based on Weekly reports described in paragraph D1(a) below to identify the actual chassis counts in effect during the course of Enrollment Period. In such case as DMV determines that additional fees are due, such additional fees must be billed no later than 45 days following end of Enrollment Period."

Paragraphs D1 - D9 of the agreement described audit procedures and provided, in paragraph D6, that "[w]ithin 3 months following end of Enrollment Period, DMV will conduct a first audit of APL PITS chassis tracking records. Any additional licensing fees found during this audit to be due will be paid by APL, but DMV will assess no penalties or interest charges against said additional fees." Under the agreement, the DMV was to advise the California Highway Patrol not to enforce trip permit regulations against APL during the period from May 1, 1989, through April 30, 1990.

In May 1989, APL began registering its chassis under the PITS program, starting with 663 newly purchased units, then switching California-registered units to the PITS program as their registrations expired, and finally transferring out-of-state units to the PITS program.[2] During 1989, APL registered a total of 7,247 units. APL interpreted paragraph C3(a) to mean the fees for these units would be based on the percentage presence in California of the entire "eligible fleet," a figure reported by APL to be 35.864 percent. During 1990, APL registered 26,132 units, including renewal of the 1989 registered units. APL reported 34.697 percentage presence

---

[2]During the final four months of the registration period, APL registered some nine thousand units that had been used mostly outside of California.

in California for the entire eligible fleet. For 1991, APL reported 26,443 registrations, mostly renewals, at the same percentage presence for the eligible fleet. APL paid $294,896, $2,236,935 and $4,039,539 respectively, for 1989, 1990, and 1991.

The DMV did not assess additional charges within 45 days, as permitted by paragraph C3(a), but within 90 days after the enrollment period ended it began an audit. The DMV's auditor concluded that applying the percentage presence in California of the entire eligible fleet instead of the percentage presence of only those currently enrolled in the PITS program contradicted the IRP. He therefore recalculated percentage presence in California to 67.122 percent for 1989, 47.501 percent for 1990 and 62.570 percent for 1991, resulting in additional fees of $272,104 for 1989, $725,831 for 1990 and $3,245,066 for 1991.

APL challenged the audit for failing to comply with paragraph C3(a) of the agreement and for recalculating the fees after expiration of the 45-day period prescribed by the same paragraph. By stipulation, the parties presented their dispute to an administrative law judge (ALJ), who conducted hearings for five days and ruled in APL's favor. The Director of the DMV (the director) then accepted written arguments about the ALJ's proposed decision and rejected the proposed decision in its entirety, ruling that the assessment of $4,229,289 in additional fees for 1989, 1990, and 1991 was proper.

APL petitioned the Alameda County Superior Court for administrative mandamus (Code Civ. Proc., § 1094.5)[3] and sought a stay of the director's decision and of the DMV efforts to require APL to pay the additional fees or lose its right to continue its trucking business. The DMV objected to the court's jurisdiction to proceed by administrative mandamus and to its authority to issue a stay, citing the constitutional prohibition against enjoining collection of a tax. (Cal. Const., art. XIII, § 32.) The DMV asserted APL was required to pay the amount due and file an action for refund.

The court denied APL's request for a stay, but ruled it had jurisdiction to proceed by administrative mandamus. To protect itself, APL paid the disputed fees and filed an action for refund while it continued to prosecute its administrative mandamus action. In the mandamus proceeding, the court remanded to the DMV and the director with directions to set aside the decision of the director. This appeal by the DMV followed.

In the meantime, APL's action for a refund proceeded in Alameda County Superior Court. APL and the DMV filed cross-motions for summary judgment. The court denied both motions, concluding there were triable issues of

---

[3]Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

fact concerning the meaning of the agreement. APL filed the petition for writ of mandate in this court. Because both the appeal and the writ petition raise the same issues and call into question the procedures for reviewing registration fee assessments, we consider them together.

## II. *Procedures for Review*

■ Article XIII, section 32 of the California Constitution provides: "No legal or equitable process shall issue in any proceeding in any court against this State or any officer thereof to prevent or enjoin the collection of any tax. After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, in such manner as may be provided by the Legislature." Citing decisions calling vehicle registration fees "taxes" (see, e.g., *Woosley* v. *State of California* (1992) 3 Cal.4th 758, 789 [13 Cal.Rptr.2d 30, 838 P.2d 758]; *Ingels* v. *Riley* (1936) 5 Cal.2d 154, 160 [53 P.2d 939, 103 A.L.R. 1]), the DMV contends the superior court lacked jurisdiction over the administrative mandamus petition filed by APL. According to the DMV, APL's only remedy was to pay the tax and bring a suit for refund.

We disagree. Although section 32 does require payment of the tax before challenging it, it does not require a "suit for refund." It authorizes the Legislature to provide the procedures for challenging a tax. The Legislature has adopted specific procedures for contesting the DMV's fleet registration fees. Vehicle Code section 8202 provides, in substantial part: "(a) Within 30 days . . . the registrant may submit documentation not previously available or may request a hearing to contest the existence or the amount of the lien. . . . [¶] . . . [¶] (c) If a hearing is requested, 10 days' notice shall be given of the time and place of the hearing . . . . The hearing shall be conducted by a referee who shall submit findings and recommendations to the director or his or her authorized representative, who shall decide the matter. . . . [¶] (d) Upon final completion of all administrative appeals, the department shall give written notice to the registrant of the right to a review of the decision by a court of competent jurisdiction. Any action brought in court shall be commenced within 90 days from the date notice of the decision is mailed."

The DMV argues that, although Vehicle Code section 8202, subdivision (d), does not specifically state that the "action" in court must be a suit for refund, California Constitution, article XIII, section 32, and case law make it clear that a suit for refund is the proper remedy. The DMV contends administrative mandate is not available because a suit for refund is an adequate remedy at law.

Vehicle Code section 8202, subdivision (d), fails to specify what kind of "action" the Legislature contemplated. Its wording, however, is more consistent with administrative mandamus than with an original action for a

refund. The section calls for superior court "review" of the director's decision after completion of all administrative appeals. Administrative mandamus is the appropriate procedure for reviewing the director's decision, which is a "final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer . . . ." (§ 1094.5, subd. (a).)

To suggest, as does the DMV, that administrative mandamus is not appropriate because a trial de novo is available to APL, is to beg the question. Unlike the circumstances in the decisions cited by the DMV (*State Bd. of Equalization* v. *Superior Court* (1985) 39 Cal.3d 633 [217 Cal.Rptr. 238, 703 P.2d 1131]; *Standard Oil Co.* v. *State Board of Equal.* (1936) 6 Cal.2d 557 [59 P.2d 119]; *Tenneco West, Inc.* v. *Franchise Tax Bd.* (1991) 234 Cal.App.3d 1510 [286 Cal.Rptr. 354]; *Royal Convalescent Hospital, Inc.* v. *State Board of Control* (1979) 99 Cal.App.3d 788 [160 Cal.Rptr. 458]; *Mystery Mesa Mission Christian Church, Inc.* v. *Assessment Appeals Bd.* (1976) 63 Cal.App.3d 37 [133 Cal.Rptr. 565]; *Malibu West Swimming Club* v. *Flournoy* (1976) 60 Cal.App.3d 161 [131 Cal.Rptr. 279]; *Szabo Food Service, Inc.* v. *State Bd. of Equalization* (1975) 46 Cal.App.3d 268 [119 Cal.Rptr. 911]; *Tivens* v. *Assessment Appeals Bd.* (1973) 31 Cal.App.3d 945 [107 Cal.Rptr. 679]), this case concerns Vehicle Code section 8202, subdivision (d), where the Legislature has prescribed "review" of the director's decision, not a de novo trial.

The purpose of California Constitution, article XIII, section 32, " 'is to allow revenue collection to continue during litigation so that essential public services dependent on the funds are not unnecessarily interrupted.' " (*State Bd. of Equalization* v. *Superior Court, supra,* 39 Cal.3d 633, 638, quoting *Pacific Gas & Electric Co.* v. *State Bd. of Equalization* (1980) 27 Cal.3d 277, 283 [165 Cal.Rptr. 122, 611 P.2d 463].) Consistent with that purpose, we conclude payment of the disputed amount is a prerequisite to seeking review under Vehicle Code section 8202, subdivision (d). APL paid the disputed fees shortly after filing the administrative mandamus action. The court therefore had jurisdiction to proceed with its review by administrative mandamus.

In the balance of the opinion, we will examine the superior court's administrative mandamus decision and its award of attorney fees and interest to APL. We will conclude the court was correct in ordering the DMV to return the additional fees and in awarding interest thereon, but erred in awarding attorney fees to APL. We will also direct issuance of a peremptory

writ of mandate to compel the superior court to terminate APL's tax refund action. It was unnecessary when filed and has been rendered moot by our decision.

## III.  *Calculating Fees*

Calculating fees under the IRP is a complicated process, made more difficult in this case by the 20-month enrollment program and altered somewhat by substitution of vehicle days in the state in place of mileage in the state. Under normal conditions, a carrier registering its entire fleet under the IRP for the first time on May 1, 1989, would *estimate* the California mileage as a percentage of the total mileage and multiply that percentage by the fees per vehicle and by the number of vehicles, adjusting for the number of months remaining in the year at the time of enrollment. It would use the following formula: California fees = a percent (presence in California) × B $ (fees per vehicle) × C (number of vehicles) × D (fraction of the year remaining). In 1990 and later years, fees would be based on actual mileages, not estimates. In those later years, the carrier would substitute for its estimated percentage the percentage of the fleet present in California based upon *actual* mileage from the "preceding year," defined by the IRP as the 12 months immediately prior to July 1, of the preceding year.

APL's substitution of days in a state for mileage in the traditional formula may have affected the calculation somewhat, because days in a state might not equate precisely with mileage in each state. However, the more significant departure from the normal approach was registering APL's vehicles over a 20-month period. This drawn-out registration, combined with waiving trip permit fees for the first 13 months,[4] permitted APL to register its fleet for a one and two-thirds-year period by paying less than one year's fees. Only those 7,000 plus vehicles enrolled during 1989 would pay any California IRP/PITS fee for that year. Those enrolled during the last month would pay very small fees. The entire fleet would have rights in California beginning May 1, 1989, but most of the fleet would not be required to pay 1989 fees or to buy trip permits to operate in California. Not even in 1990, when the balance of the fleet enrolled, would each vehicle pay a full year's registration fee. Newly registered vehicles would pay only for that portion of the year remaining at the time of enrollment. Nonetheless, the entire fleet would be exempt from trip permit fees until June 1990.

The DMV could have prevented this result by either (1) requiring trip permit fees for all nonregistered vehicles operating in California, or (2)

---

[4]The DMV extended the original 12-month trip permit exemption 1 month to May 31, 1990. The exemption did not apply to the short-term-leased chassis, which APL did not intend to register in the PITS program. APL was required to make quarterly payments for the trip permits for these chassis.

requiring that APL register *all vehicles* as of May 1, 1989, paying fees for each apportioned for the fleet's percentage presence in the state.[5] To satisfy APL's concern about double registration fees for California registered chassis, it could have given APL credits for unused time on the prior registrations. Instead of taking either of these approaches, the DMV entered into an agreement which, from all appearances, permitted a favorable apportionment of fees for registered vehicles, delayed registration of vehicles, and waiver of trip permit fees for registered and nonregistered vehicles.

The DMV's auditor stated a variety of reasons for rejecting APL's estimate of the percentage presence in California. If a clause contradicted the IRP, he could not apply it. He did not take the words "eligible for enrollment" literally because in his view every chassis in the world was eligible for enrollment by APL. He believed "determined by APL to be eligible for enrollment" did not mean much because APL could enroll any chassis. He believed APL should be basing the percentage on the chassis it actually planned to enroll each year, not the entire group of eligible chassis. The DMV's auditing supervisor testified that the DMV ignored paragraph C3(a) because it departed from the California manual.[6]

The DMV makes a two-front attack, arguing both that the agreement could not override the IRP and that, properly interpreted, the agreement only permitted APL to use the entire eligible fleet as the denominator for the fraction for *estimating* California presence not for the fraction for computing actual fees. Once enrollment ended and *actual* percentage presence in the state was known, according to the DMV, the denominator of the fraction

---

[5]Although the director concluded, and the DMV asserts, that the problem was that APL delayed enrollment of many of its chassis, this was only a very small part of the problem. Even if APL had enrolled the same number of chassis each month and had maintained a constant 35 percent California presence for the enrolled chassis, the DMV would not have received the same fees it would have received by registering all the chassis on May 1, 1989. Under the applicable formula, using $400 per chassis, a constant 35 percent presence and constant monthly enrollment of 1,300 chassis between May 1, 1989, and December 31, 1990, the fees would have been $545,000 in 1989 (APL paid $294,896) and $2,214,000 in 1990 (APL paid $2,236,935) for a total of $2,759,000 (APL paid $2,531,831). This is to be contrasted with $2,427,000 for 1989 and $3,640,000 for 1990, for a total of $6,067,000, if all 26,000 chassis had been registered on May 1, 1989, and were reregistered for 1990. Constant monthly enrollment by APL would have netted only $227,000 more than APL voluntarily paid. This still would have left the DMV some $3,308,000 short of what it would have received if the entire fleet had registered on May 1, 1989 (adjusted downward a small amount for trip permit fees paid in 1990). *It is clear the 20-month enrollment period and waiver of trip permit fees, not the order in which APL chose to register its chassis, were the problems for the DMV.*

[6]According to the record he also said that it was a major departure from the "terms and conditions of APL." He probably meant "terms and conditions of the IRP" and either misspoke or was reported wrong.

would change. The fees were calculated based on the new fraction, using percentage presence of only the enrolled vehicles.

Under APL's approach, the percentage presence in California remained relatively constant from 1989-1991. Roughly 35 percent of the eligible fleet was present in California throughout that period.[7] APL calculated fees based on the 35 percent figure and paid those fees on each vehicle registered in 1989, 1990, and 1991. Because registration started out slowly and continued throughout 1989 and 1990, with some 9,000 chassis registered during the last few months of 1990, the fees for 1989 and 1990 were considerably less than had APL enrolled the entire fleet on May 1, 1989, and paid fees from that date.

The DMV recalculated the percentages based on each year's average percentage presence in the state of only those vehicles enrolled, leading to percentages as high as 67 percent. If the DMV's calculations were correct, APL owed an additional $272,104 for 1989, $725,831 for 1990 and $3,245,066 for 1991.

### IV. *Interpretation of the Agreement*

■ "The interpretation of a written instrument, even though it involves what might properly be called questions of fact [citation], is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect. [Citations.] Extrinsic evidence is 'admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible' [citations], and it is the instrument itself that must be given effect. [Citations.] It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence. Accordingly, 'An appellate court is not bound by a construction of the contract based solely upon the terms of the written instrument without the aid of evidence [citations], where there is no conflict in the evidence [citations], or a determination has been made upon incompetent evidence [citation].' [Citations.]" (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839], fn. omitted.)

■ Various witnesses testified about their interpretations of the key paragraphs of the agreement. It was the "understanding" of Sandra Bassett,

---

[7]Although APL included some leased chassis it did not actually enroll, and used 38,000 for the denominator of the fraction, the 35 percent figure would have been roughly the same if APL had included only the 26,000 vehicles it actually enrolled. Evidently the leased chassis had roughly the same California presence as the rest of the fleet.

the DMV's interstate audit unit manager, that the agreement provided for calculating based on only the enrolled chassis and that APL would enroll vehicles in proportion to their California presence. She believed the agreement gave the DMV the option to recalculate fees within 45 days, but that it could also do so during the postregistration audit. Terry Wilson, who was head of the DMV Interstate Operating Authority Unit when the agreement was negotiated, believed that the percentage would be based on the entire eligible fleet, but he also expected all the chassis would be enrolled.

Patricia Klemm, employed by APL when the agreement was entered, "understood" paragraph C3(a) to base fees on the percentage presence in California of the total eligible fleet. She believed that paragraph allowed APL to enroll chassis in batches with the percentage remaining fixed because it was based on the whole fleet, not those being enrolled. She had not looked as far as 1991 to determine what would happen to those fees, but she did not believe it was covered by the agreement.

APL's consultant, Kristine Anderson, was surprised that the DMV was letting APL enroll the fleet over a 20-month period. She would have advised APL not to distort the percentage by its selection of when to enroll which chassis.

This testimony and the other evidence presented at the administrative hearing only show how certain witnesses read the agreement, how a consultant advised APL about it, and what actions the parties took under the agreement. None of it shows that specific terms of the agreement had acquired particular meanings through trade usage or meant something special to the parties (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 38-40 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]).

Having considered all the evidence presented at the administrative hearing, we conclude that none of the determinations made at the administrative hearing or in the superior court were factual determinations. We are not bound by the interpretations made below. We interpret the agreement by examining its terms and the context in which it was drafted, including the reasons for entering a separate agreement and its relationship to the IRP.[8]

---

[8]The superior court denied summary adjudication in the refund action because it found the terms of the agreement ambiguous and believed a court would need to study the credibility of witnesses concerning circumstances and discussions surrounding the agreement and concerning the ordinary operation of the IRP program. The situation is different in this appeal because the matter was fully tried before the ALJ and the director and superior court had a full record before them. We review the matter based upon a complete record.

## V. *Was the DMV Required to Recalculate Fees Within 45 Days?*

The final sentence in paragraph C3(a) of the agreement provided: "In such case as DMV determines that additional fees are due, such additional fees must be billed no later than 45 days following end of Enrollment Period." The superior court did not determine whether the DMV's formula for calculating fees was correct because it concluded the DMV was barred from recalculating the fees by failing to do so within 45 days. The DMV insists, however, that its recalculation was authorized by paragraph D6, which required a first audit of APL records within three months following the end of the enrollment period.

We agree with the DMV. Paragraph C3(a) did not create the exclusive means for the DMV to recalculate fees. The sentence preceding the 45-day limit stated: "Once Enrollment Period is completed, DMV shall have the option to recalculate fees due based on Weekly reports described in paragraph D1(a) below to identify the actual chassis counts in effect during the course of Enrollment Period." The meaning of this phrase is clear and is conceded by APL. Whereas APL's estimated percentage would be based upon a "snapshot" of the fleet's presence on one particular day each year, the DMV could recalculate that percentage based upon weekly reports of the fleet's presence if they presented a more accurate picture. This was merely an "option" to recalculate. If, as may have been the case here, the DMV found that the "snapshot" gave roughly the same picture as the weekly reports, it probably would not recalculate percentages. We conclude that failure of the DMV to exercise its option did not have the collateral effect of preventing it, during a full audit of the fees, from disagreeing with APL's formula for the calculation.

Paragraph D of the agreement defined audit requirements, including, in paragraph D2, the required first audit: "Within 3 months following end of Enrollment Period, DMV will conduct a first audit of APL PITS chassis tracking records. Any additional licensing fees found during this audit to be due will be paid by APL, but DMV will assess no penalties or interest charged against said additional fees." Although the main function of this audit may have been to review APL's cost, weight and location records for accuracy, the section did not restrict the DMV to those areas of review. It provided that "[a]ny additional licensing fees found during this audit to be due will be paid by APL." It therefore was appropriate, during the audit, for the DMV to challenge APL's formula for calculating percentage presence of its fleet. As a necessary part of challenging APL's formula, the DMV

recalculated the fees under its own formula, using the weekly reports to do so. This is not the same operation it declined to perform when it failed to exercise its option under paragraph C3(a). We turn next to the DMV's challenge to the formula.

## VI. *Was APL's Formula Correct?*

Paragraph C3(a) provided that the base fleet calculation would be multiplied by "the percentage of the fleet of chassis determined by APL to be eligible for enrollment that are physically located in each trailer state" and gave the DMV the option to recalculate fees to "identify the actual chassis counts in effect during the course of Enrollment Period." The DMV asserts that this provision must be interpreted to provide that the initial estimate by APL would give way to actual historical data and that additional fees would be assessed once the fleet was fully enrolled. According to the DMV, the fees would then be based on the percentage presence in California of the chassis actually enrolled, not of the entire fleet. According to the DMV, only this approach would lead to the fees appropriate for the actual operation of APL chassis on California highways. Citing paragraph F2 of the agreement, DMV contends that if paragraph C3(a) were to provide lower fees than the IRP, it would have to yield to the IRP.

Paragraph F2 of the agreement provides: "In such case as this Letter of Agreement may be in conflict with the terms and conditions of the International Registration Plan, IRP Uniform Operational Audit Procedure Guidelines and/or the American Association of Motor Vehicle Administrators (AAMVA) Motor Carrier Services Policy and Position Statements (hereinafter 'IRP Particulars'), IRP Particulars shall prevail."

We reject the DMV's assertion, accompanied by no citation to authority and no argument, that this provision prevents operation of paragraph C3(a) or compels its interpretation in the DMV's favor. The DMV concedes the purpose of the letter agreement was to adapt operation of the IRP to the special needs of APL.[9] The agreement would not have served that purpose if it had merely recited or incorporated the terms of the IRP. The DMV may not now disavow a key clause of the agreement while continuing to rely upon other portions of the agreement more favorable to the DMV, such as

---

[9]Strict application of the IRP was impossible unless APL were to install odometers on all its chassis or to compel all its drivers to keep accurate mileage records for the chassis. Registration of 30,000 chassis at the same time would have been an administrative nightmare for both the DMV and APL.

the agreement's permission to replace the estimates with actual figures for purposes of assessing fees for the first year of operation.[10]

The director's administrative decision recognized that interpreting paragraph C3(a) was the central issue of the dispute. Instead of focusing upon the wording of the section, however, the director concentrated upon the conduct of APL. He first acknowledged APL was justified in using a percentage of the entire North American fleet because eventually the percentage operation in California should reach that figure. Then he noted, however, that by enrolling California-based vehicles first, APL reduced from 100 percent to 34.910 percent the fees they would pay on those vehicles and that by deferring enrollment of half the remaining fleet until the last four months APL made another significant cost saving.

Without saying how APL violated the agreement, the director then concluded: "APL's voluntary actions had the necessary consequence of distorting the California percentage of 34.910 percent that very likely could have been realized had APL elected to enroll its. California-based vehicles and other vehicles operating primarily out-of-state in equal proportion. APL paid lower fees during the enrollment period by its selection of time and order in which various vehicles were enrolled, and the audit of registration years 1989, 1990 and 1991 recaptured fees that would otherwise have mostly been paid in 1989 and 1990. The Department audit puts APL in position to pay fees equivalent to those that would have accrued had APL been able to enroll its entire fleet on May 1, 1989."

The ALJ paid more attention to the agreement than did the director. She perceptively observed that "neither party thought through the full extent of the consequences of this lengthy enrollment period" and concluded that "the consequences of there being a discrepancy between the enrolled chassis percentage and the eligible chassis percentage was a foreseeable consequence of the agreement and cannot now be disavowed by DMV."

As we mentioned above, the superior court did not interpret and apply the phrase "percentage of the fleet of chassis determined by APL to be eligible for enrollment that are physically located in each trailer state." Instead, the court concluded the DMV was barred from recalculating because it did not do so within 45 days after enrollment was completed. Having concluded above that the 45-day limitation was not a bar to recalculation, we consider whether the result reached by the superior court should be affirmed on

---

[10]Under the IRP the initial application is based on actual operation for the preceding year, unless no operations were conducted the preceding year, in which case the fees will be based upon an estimate.

another ground. If the DMV's recalculation was improper, the court's decision was correct, albeit not for the reason stated.

Our tasks are to determine what formula the agreement prescribed and whether APL followed it. Paragraph C3(a)'s formula is clear—percentage presence is based upon the fleet, "determined by APL to be eligible for enrollment." The issue here is whether, as the DMV claims, paragraph C3(a) controls only APL's estimate and not computation of actual fees due, which would be based on percentage presence of only that portion of the fleet actually enrolled at the time the percentage was calculated. APL also identifies a subissue: whether the agreement required APL to enroll its chassis in any particular order.

### a. *Enrollment in a Particular Order*

The DMV hedges on this subissue. It admits it never has maintained that the agreement required APL to enroll its chassis in a particular order. It says, however, that APL should not have been permitted to distort the fees downward by its selection of the order of enrollment.

The agreement is quite clear on this point. It provides "APL will enroll owned and long-term leased chassis in the PITS program. Applications shall be made in quantities to be determined by APL." It is too late to amend the agreement to satisfy the DMV's unexpressed wishes for it.

### b. *Estimate Versus Actual*

The DMV points to no clause in the agreement making paragraph C3(a) apply only to an *estimate* of the fees due. The DMV argues, however, that its right to recalculate fees based on weekly reports and to audit the chassis tracking records permitted it to substitute enrolled vehicle figures in place of the estimates used by APL.

The DMV is correct that under the 45-day recalculation provision and the audit provision, it could replace APL's estimates with reports of actual chassis locations. The next step, however, is a huge leap. The DMV's auditors asserted a right to substitute a new formula for that prescribed in paragraph C3(a)—to use data for only the enrolled chassis, not for the entire eligible fleet, when examining presence in California and computing the percentage.

We agree with APL that the DMV's position "amounts to nothing more than a plea to refashion the Agreement into the one for which it now believes

it should have bargained." Although the superior court acted for other reasons, we conclude the court was correct in setting aside the director's decision about fees for 1989 and 1990, years clearly subject to the agreement. We affirm that part of its decision and turn our attention to fees for 1991.

## VII.   *Does the Same Formula Apply to 1991?*

■   The director concluded 1991 fees should be based upon the IRP, not the agreement. His decisions stated: "The audit of registration year 1991 was conducted under authority of the IRP, and it only utilized the Agreement to derive actual percentages of California operation from the inventory records maintained by APL pursuant to the Agreement. APL may have estimated the operations of its fleet during the enrollment period using data from all vehicles operating in North America as a guide; however, both the Agreement and Articles XV, XVI and XVII of the IRP contemplate an audit using source documents recording actual operations (whether recorded by miles or days) to determine appropriate fees that should be paid." The director agreed with the department auditors: "Analysis of the operation of the enrolled fleet for the registration year 1991 using the required IRP reporting period of July 1, 1989 through June 30, 1990 (although records were only produced from September 1, 1989 through June 30, 1990), indicated that the actual California percentage was 62.570 percent instead of the reported 34.697 percent (which can no longer be an estimate). Additional fees of $3,245,066 are due from APL for that year (1991)."

Both the ALJ and the superior court disagreed with the director about 1991. The superior court, following the ALJ's analysis closely, concluded that "[t]he logical extension of the provisions of the Agreement would be that the reporting year under the International Registration Plan would not become effective to determine the percentage of operations in California until one year after the enrollment period, so that the 1993 percentage will be determined by the enrolled chassis from July 1, 1991, to June 30, 1992. The DMV therefore is barred from assessing additional fees for 1991. The additional fees for 1991 in the amount of $3,245,066, included in the Audit Report dated October 16, 1991, are a breach of the Agreement and are improper."

We must determine whether the director or the superior court is correct about when the agreement stopped controlling the fees and when the IRP took over.

The agreement identified May 1, 1989, through December 31, 1990, as the expected enrollment period but said very little about what would happen

after December 31, 1990. If new chassis were enrolled after completion of the enrollment period, fees would be based on "the percentage of the enrolled fleet physically located in each state for each IRP reporting year." Thus, a chassis registered for the first time in January 1991 would be assessed based on the percentage for IRP reporting year 1991. However, the agreement did not explain whether the 1991 percentage would be the same as that during the enrollment period, as APL asserts, or would be the actual percentage operation of the vehicles enrolled between July 1, 1989, and June 30, 1990, as it would be under the DMV's approach.

The agreement also said nothing about how fees would be determined for renewal in 1991 of the registrations for the vehicles registered during the enrollment period. The superior court found it "logical" to extend the 1989 and 1990 formula to 1991. It would also have been logical for IRP procedures to begin as soon as the extended enrollment period ended. Although it did not address the renewal question, paragraph C3, by distinguishing between fees under subdivision (a)—for chassis enrolled during the period— and fees in subdivision (b)—for chassis enrolled after the enrollment period —suggested that the enrollment period was an exception to the general rule and that the IRP should take effect at the end of the enrollment period.

As discussed earlier, paragraph F2 stated that in case of conflict with the IRP, the IRP shall prevail. In our earlier discussion, we rejected the DMV's attempt to apply paragraph F2 to override the formula stated clearly by C3(a). Nevertheless, we find paragraph F2 applicable here, where the agreement was silent about 1991 renewal fees. Faced with a choice between the "logical extension" of the agreement to a year not covered by it and application of F2, we apply paragraph F2 and find the IRP provisions applicable to 1991 renewal fees, subject, of course, to the parties' continuing agreement that APL would use days in the state instead of miles when determining percentage presence.

Having concluded that the IRP applies does not mean, however, that the DMV correctly applied the IRP when computing 1991 fees. We consider now how fees for 1991 should have been computed.

The DMV purported to apply the IRP by basing 1991 fees upon the "preceding year" reports, meaning those governing the period from July 1, 1989, through June 30, 1990, which, according to the DMV calculations showed a weighted average of 62.570 percent presence in California for the enrolled chassis. The DMV then applied that percentage to all chassis reregistered in 1991, regardless of whether a particular chassis or the entire

group of reregistered chassis had a previous history of 62 percent presence. Thus, although the average presence in California of the chassis registered by APL in 1991 was close to APL's estimate of 35 percent, the DMV assessed the chassis as if they were present in California approximately 62 percent of the time.

The basic principle for determining registration fees is stated in section 300 of the IRP. Under that section,[11] the registration fee is to be determined by computing the percentage presence during the preceding year of the vehicles and multiplying that percentage by the total fees for "each vehicle" to be registered. Section 300 does not specify which vehicles should be included in the computation of percentage presence. Under normal circumstances, it probably makes little difference whether the applicant uses the figures for vehicles enrolled during the "preceding year," which ended six months earlier or instead uses the figures for all those vehicles the applicant intends to renew for the new registration year. In most cases the same vehicles will constitute both groups. Even when the vehicles in the two groups are different, their movement histories will probably be substantially similar, yielding similar percentages regardless of which group is used.

Here, however, where 9,000 vehicles were enrolled after June 30, 1990, and their movement histories differed significantly from those enrolled earlier, identifying the proper group is crucial. The DMV computed its percentage presence of over 62 percent from reports covering only those vehicles enrolled between July 1, 1989, and June 30, 1990. The DMV's figure ignored the history of some 9,000 vehicles enrolled during late 1990 and then renewed in 1991. Including those 9,000 vehicles would have lowered the percentage to about 35 percent. We conclude that the DMV misapplied section 300 of the IRP when it selected the smaller of the two groups. It violated the principles of the IRP and reached a result that reflected neither the actual history of APL's fleet nor the fleet's estimated operation for 1991.

Two other sections of the IRP provide computation methods closer to that applied by the DMV. We consider now whether either section might justify the DMV's computation. Under section 600 of the IRP, for vehicles "acquired by the registrant after the commencement of the registration year and

---

[11]Section 300 provides in full: "DETERMINATION OF FEES [¶] A. The registration fee for apportionable vehicles shall be determined as follows: [¶] 1. Divide the in-jurisdiction miles by the total miles generated during the preceding year. [¶] 2. Determine the total fees required under the laws of each jurisdiction for full registration of each vehicle at the regular annual or applicable fees, or for the unexpired portion of the registration year. [¶] 3. Multiply the sum obtained under Paragraph 2 of this section by the quotient obtained under Paragraph 1 of this section."

added to the apportioned fleet," the applicant is to apply to the new vehicles the percentage used on the original application for the fleet. Clearly this section does not apply to APL's 26,000 renewed vehicles, which were not acquired after the commencement of 1991.

Section 800 of the IRP arguably would justify the DMV's percentage if it applied to the fleet identified by DMV. It states: "Initial application for apportioned registration shall state the mileage data in all jurisdictions for the preceding year with respect to such vehicle or vehicles. If no operations were conducted with such vehicle or vehicles during the preceding year, the application shall contain a full statement of the proposed method of operation and estimates of annual mileage in each of the jurisdictions. The registrant shall determine the in-jurisdiction and total mileage to be used in computing the proportional registration fee for the vehicle or vehicles. The base jurisdiction Commissioner may adjust the estimate in the application if the base jurisdiction Commissioner is not satisfied with its correctness." The DMV's percentage purports to be based upon the "preceding year" data with respect to the APL fleet. The percentage favors the DMV because the "preceding year" ended before APL finished enrolling its vehicles. The figures do not accurately reflect the movement of the entire APL fleet.

The DMV concedes that 1991 was a renewal year and that APL's initial application year was 1989. The DMV then points to paragraph C3(b) of the agreement to show that, whatever approach is used, the percentage should be based only on the "enrolled fleet" from the preceding year and should not be drawn from the history of APL's entire fleet.

Neither section 800 of the IRP nor paragraph C3(b) applies to the 1991 computation. In 1991 APL renewed the registrations for its fleet. It did not submit an "initial application" as contemplated by section 800. Nor were its fees covered by paragraph C3(b), for two reasons: (1) as explained above, the agreement did not apply to 1991, and (2) even if it did apply, subdivision (b) is for "chassis enrolled" following completion of the enrollment period, not for renewal of the registrations for vehicles already enrolled during the enrollment period.

We conclude that section 300 of the IRP governed the fees for 1991, which should have been computed based upon data for APL's entire fleet. The DMV's reasons for not applying section 300 or, if applying section 300, relying only on data for part of the APL fleet, are somewhat obscure. The DMV contends the calculation should be based "only on units actually apportioned in the fleet during the preceding year," and cites as authority IRP sections 220, 222, and 300 and California Based Apportioned Registration Manual, Renewal Instructions, page 43.

None of these citations supports the DMV's limitation to vehicles enrolled before July 1, 1990. Section 220 of the IRP defines a fleet as "one or more apportionable vehicles." An "apportionable vehicle" is one used in two or more jurisdictions that proportionally register vehicles (§ 204). Section 222 defines "in-jurisdiction miles" to mean the miles operated by a fleet in a jurisdiction during the preceding year. Section 300 bases fees on "in-jurisdiction miles" during the "preceding year."

These sections do not restrict the scope of the "fleet" or limit the "in-jurisdiction miles" in the "preceding year" to the miles traveled only by the vehicles enrolled in the jurisdiction during the "preceding year." The 9,000 vehicles enrolled after July 1, 1990, were part of APL's fleet and had "in-jurisdiction" days during the "preceding year," but the DMV did not take into account those days.

Page 43 of the California Based Apportioned Registration Manual, also cited and quoted by the DMV, directs a carrier renewing registrations to "enter the total number of miles operated by the fleet in every jurisdiction during the mileage reporting period . . . . [¶] Actual mileage must be reported for all fleets that operated for one full month or more during the preceding mileage reporting period." Again, the cited authority does not impose the DMV's restricted view of the "fleet" for which the preceding year's mileage will be reported.

We affirm the superior court's nullification of the DMV's added fees for 1991.

## VIII.   *Attorney Fees and Interest*

The DMV contends the court erred in awarding attorney fees to APL under Government Code section 800 and interest pursuant to Civil Code section 3289. The DMV argues interest should not have been awarded because the DMV did not breach a contract. Attorney fees could be awarded only if the DMV took arbitrary or capricious action. The DMV says it did not. APL contends the court properly found the director's decision arbitrary and capricious and that the DMV's action amounted to breach of the contract. According to APL, the awards of both interest and attorney fees were justified.

### a.   *Attorney Fees*

Government Code section 800 provides in part: "In any civil action to appeal or review the award, finding, or other determination of any administrative proceeding under this code or under any other provision of state law

. . . where it is shown that the award, finding, or other determination of the proceeding was the result of arbitrary or capricious action or conduct by a public entity or an officer thereof in his or her official capacity, the complainant if he or she prevails in the civil action may collect reasonable attorney's fees . . . ."

■ " 'The award of attorney's fees under Government Code section 800 is allowed only if the actions of a public entity or official were wholly arbitrary or capricious. The phrase "arbitrary or capricious" encompasses conduct not supported by a fair or substantial reason, a stubborn insistence on following unauthorized conduct, or a bad faith legal dispute.' [Citations.] Attorney's fees may not be awarded simply because the administrative entity or official's action was erroneous, even if it was 'clearly erroneous.' [Citation.]" (*Stirling* v. *Agricultural Labor Relations Bd.* (1987) 189 Cal.App.3d 1305, 1312 [235 Cal.Rptr. 56].)

■ In our previous discussion we concluded the director erred in interpreting the agreement and sustaining the DMV's additional charges. The question before us now is whether the director's erroneous decision and the award stemming from it were arbitrary or capricious within the meaning of the statute.

The decision under Government Code section 800 is essentially one of fact within the sound discretion of the trial court (see *Abshear* v. *Teachers' Retirement Board* (1991) 231 Cal.App.3d 1629, 1638 [282 Cal.Rptr. 833]; *Forrest* v. *Trustees of Cal. State University & Colleges* (1984) 160 Cal.App.3d 357, 368 [206 Cal.Rptr. 595]). We conclude, however, that the superior court abused its discretion in awarding attorney fees. It is true the director sought to minimize the adverse effect of a key clause in the agreement and to read into the audit power the authority to change the fraction used for computing fees. The director's interpretation was incorrect, but it was not a bad faith legal position. It was supported by substantial reason, seeking, as it did, to approximate the fees the DMV would have recovered had APL registered its fleet on May 1, 1989, without the agreement. The award of attorney fees was therefore unwarranted.

### b. *Interest*

Interest on the award is another matter. Civil Code section 3289 provides for an award of interest at the rate stated in the contract or, if none is stated, at a rate of 10 percent per annum after a breach of contract until the contract is superseded by a verdict or a new obligation. The DMV presents no theory for avoiding payment of interest on the charges the DMV will be required to

repay APL. These charges were imposed by the DMV in breach of the agreement and as wrongfully collected taxes. (See *Todd Shipyards Corp.* v. *City of Los Angeles* (1982) 130 Cal.App.3d 222, 225-227 [181 Cal.Rptr. 652].)

The judgment granting a writ of administrative mandamus is reversed insofar as it awards APL attorney fees. In all other respects, the judgment is affirmed.

Let a peremptory writ of mandate issue directing the Alameda County Superior Court to vacate its order and enter a new order dismissing the tax refund action as moot.

APL is awarded costs in these two appellate proceedings.

Chin, P. J., and Corrigan, J., concurred.

A petition for a rehearing was denied October 26, 1995, and appellant's petition for review by the Supreme Court was denied January 4, 1996.