[No. A068753. First Dist., Div. Three. Nov. 3, 1998.]

SANDRA L. BADIE et al., Plaintiffs and Appellants, v.
BANK OF AMERICA, Defendant and Respondent.

## COUNSEL

The Sturdevant Law Firm, James C. Sturdevant and Ann Saponara for Plaintiffs and Appellants.

John F. Cooney, Arne D. Wagner, Michael J. Halloran, Morrison & Foerster, Seth M. Hufstedler, Kathleen V. Fisher, Carla B. Oakley and Jennifer Lee Taylor for Defendant and Respondent.

## OPINION

**PHELAN, P. J.**—Plaintiffs, four individuals and two consumer-oriented organizations, Consumer Action and California Trial Lawyers Association,[1] challenge the validity of an alternative dispute resolution (ADR) clause which Bank of America (the Bank) sought to add to existing account agreements between itself and its deposit account and credit card account customers by sending those customers an insert with their monthly account statements (hereafter, bill stuffer), notifying them of the new term. None of the individual plaintiffs had a deposit account with the Bank, but all had the Bank's credit cards.[2]

Plaintiffs filed their complaint shortly after the Bank began sending the bill stuffers to its customers. All six plaintiffs, acting as private attorneys

[1]Now renamed the Consumer Attorneys of California.

[2]Howard Suer opened a Visa account in the 1960's. Muriel Kraszewski opened both a Visa account and a MasterCard account in the 1960's. Sandra Badie opened a Visa account in 1990, before she was married. Paul Badie became an authorized user of that account in 1991, after he married Sandra. The Badies at one time had a deposit account with Security Pacific

general, sought to enjoin implementation of the ADR provision on the ground that its addition to the account agreements violated the Unfair Competition Act, Business and Professions Code section 17200 et seq. The four individual plaintiffs alleged two additional causes of action on their own behalf. In one, they sought to enjoin implementation of the ADR provision on the ground that its addition to the account agreements violated the Consumer Legal Remedies Act, Civil Code section 1750 et seq., and in particular section 1770, former subdivisions (n) and (s).[3] In the other, they sought a declaration as to the validity and enforceability of the ADR clause.

After a 17-day nonjury trial, the trial court entered judgment in favor of the Bank, ruling that the change of terms provision in the original account agreements permitted the addition of the ADR clause, and that the new provision was enforceable because it was not unfair or unconscionable and was consistent with the covenant of good faith and fair dealing. The trial court also ruled that plaintiffs had failed to prove their Consumer Legal Remedies Act claim.

Plaintiffs timely appealed. While they make numerous arguments referring to the alleged unfairness, unlawfulness, deceptiveness and unconscionability of the ADR clause and the Bank's method of adding it to the account agreements, nowhere in either their opening brief or their reply brief do they directly address the statutory causes of action they brought under Business and Professions Code section 17200 et seq. or Civil Code section 1770, subdivision (a)(14) and (19). Indeed, the briefs do not even so much as cite to the Unfair Competition Act or the Consumer Legal Remedies Act, much less discuss their provisions or their application to the evidence presented at trial and to the causes of action framed under them. When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as

National Bank (Security Pacific), which was acquired by the Bank in the spring of 1992. Sandra Badie testified that she closed the Security Pacific account but then began receiving written material from the Bank. Although she contacted the Bank repeatedly over a period of several months, it was not until January 1993 that the Bank acknowledged the account was closed. The written material that was sent to the Badies before the Bank acknowledged their account was closed did not include the bill stuffer, as it was not sent to any former Security Pacific customer.

[3]Civil Code section 1770 was amended in 1996 to redesignate former subdivisions (a) through (w) as (a)(1) through (a)(23). Former section 1770, subdivision (n) is now designated section 1770, subdivision (a)(14), and former section 1770, subdivision (s) is now designated section 1770, subdivision (a)(19). All references to these subdivisions will be to the new designations. Section 1770, subdivision (a)(14) provides that in a transaction intended to result in, or which results in, the sale or lease of goods or services to any consumer, "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law," is unlawful. Under section 1770, subdivision (a)(19), "[i]nserting an unconscionable provision in the contract" is unlawful.

waived. (*People* v. *Stanley* (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481]; *Tiernan* v. *Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [188 Cal.Rptr. 115, 655 P.2d 317]; *Muega* v. *Menocal* (1996) 50 Cal.App.4th 868, 877 [57 Cal.Rptr.2d 697]; *San Mateo County Coastal Landowners' Assn.* v. *County of San Mateo* (1995) 38 Cal.App.4th 523, 559 [45 Cal.Rptr.2d 117]; *Kim* v. *Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [21 Cal.Rptr.2d 834].) We therefore limit our review to the trial court's disposition of the third cause of action for declaratory relief as to the validity and enforceability of the ADR clause brought by the individual plaintiffs.

## BACKGROUND

Starting in June 1992 and for a period of several months thereafter, the Bank mailed half-page bill stuffers to its personal credit card and deposit account customers, informing them that, from that time forward, any dispute between a customer and the Bank regarding customer accounts would be resolved either "by arbitration or by reference" if either the Bank or customer so requested.[4] The full text of the bill stuffer sent to personal credit account customers reads as follows: "Change of Terms Notice for BankAmericard® Visa,® MasterCard,® Visa Gold, Gold MasterCard, and Apollo® Accounts [¶] **Dispute Resolution**—If you or we request, any controversy with us will be decided either by arbitration or reference. Controversies involving one account, or two or more accounts with at least one common owner, will be decided by arbitration under the Commercial Arbitration Rules of the American Arbitration Association. All other controversies will be decided by a reference under California Code of Civil Procedure Section 638 and related sections. A referee who is an active attorney or retired judge will be appointed by the court after selection by the American Arbitration Association using its procedures for selecting arbitrators. The arbitration or reference will take the place of a trial before a judge and jury. (This is a new provision for Cardmember and Apollo Account Agreements. If you continue to use your account, this new provision will apply to all past and future transactions.)" (Bold in original.) The Bank's intention in sending the bill stuffer was to add a new provision to the existing account agreements. In attempting to add the ADR clause to the existing agreements, the Bank relied upon the change of terms provision included in the original account agreements, which gave the Bank the

---

[4]Because the individual plaintiffs had only credit card accounts and our review concerns only the trial court's disposition of the cause of action for declaratory relief brought by the individual plaintiffs and not the Unfair Competition Act claim brought as private attorneys general with respect to both deposit accounts and credit accounts, we need not discuss the nature of the agreements with deposit customers or the bill stuffer sent to them.

unilateral right to modify the agreements after customers entered into them. It is undisputed that the account agreements were contracts of adhesion.[5]

The contract documents comprising the original credit account agreements consisted of either an application or, if the account was opened in response to a direct mail solicitation to accept a "pre-approved" credit card, an "Acceptance Certificate," plus a document referred to as an account agreement and disclosure statement, which was sent to the customer after the account was opened. A change of terms provision was included in each of these documents. The applications and acceptance certificates, which took various forms, set forth the Bank's annual percentage rate for purchases, its annual membership fee, its transaction fee for cash advances, its late payment fee, its method of computing balances for purchases, and its grace period for repayment of the balance for purchases. All of the exemplars of these forms which were admitted into evidence included a provision stating, "All terms are subject to change." All of them also stated that the signer agreed to be bound by the "terms and conditions of the agreement and disclosure statement" that would be sent to the signer with his or her cards.

The account agreement and disclosure statement provided a more detailed description of the account features, including fees, the method of calculating balances and finance charges, how payments were applied, the circumstances under which the Bank would close an account, and so forth. Multiple exemplars of the account agreement and disclosure statement were admitted into evidence. Some pertained to Visa accounts, and some pertained to MasterCard accounts. All versions of the agreement presented at trial included a provision labeled "Change of Terms," which was set forth in a section headed "Other Important Information." In most versions, which were dated between April 1988 and June 1992, the change of terms provision stated, "We may change any term, condition, service or feature of your Account at any time. We will provide you with notice of the change to the extent required by law." In two versions of the agreement, one a December 1989 reprint of an April 1986 version of the document pertaining to both Visa and MasterCard accounts, and the other an August 1988 version pertaining to Visa Gold accounts, the change of terms provision was worded as follows: "WE MAY CHANGE OR TERMINATE ANY TERMS, CONDITIONS, SERVICES OR FEATURES OF YOUR ACCOUNT (INCLUDING INCREASING YOUR FINANCE CHARGES) AT ANY TIME. WE MAY IMPOSE ANY CHANGE IN

---

[5]"The term signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." (*Neal* v. *State Farm Ins. Cos.* (1961) 188 Cal.App.2d 690, 694 [10 Cal.Rptr. 781].) The fact that a contract is one of adhesion does not mean that it is also an "unconscionable" contract. (See *California Grocers Assn.* v. *Bank of America* (1994) 22 Cal.App.4th 205, 215-217 [27 Cal.Rptr.2d 396].)

TERMS ON YOUR OUTSTANDING BALANCE, AS WELL AS ON SUBSEQUENT TRANSACTIONS AND BALANCES. We may also add new terms, conditions, services or features to your Account. To the extent required by law, we will notify you in advance of any change in terms by mailing a notice to you at your address as shown on our records." (Upper case and bold in original.) By mid-1992, the two versions of the account agreement that included this wording of the change of terms provision had been superseded. The language expressly allowing the Bank to *add* new terms was deleted from the versions of the agreement and disclosure statement that were in effect at the time the ADR bill stuffers were mailed to credit account customers. Neither party provided exemplars of cardmember agreements older than the late 1980's, so it is not entirely certain whether the earlier versions of these documents contained change of terms provisions, or, if they did, whether the language allowing the Bank to *add* new terms was included in such provisions. The Bank's expert witness did testify, however, that including a change of terms provision in account agreements had been the standard industry practice since bank credit cards first became available in the 1960's.

None of the agreements admitted into evidence contained any provision regarding the method or forum for resolving disputes. The only portions of the agreements that touched even obliquely on dispute resolution were general admonitions in the Fair Credit Billing Act notice, which was included in each agreement, regarding the need to notify the Bank promptly of suspected mistakes or questions about the bill; a reference under the heading "OTHER BANKCARD FEES AND CHARGES" to "court costs" a customer would be required to pay in the event the Bank incurred them while enforcing its rights if a customer defaulted; and a reference to the Bank's ability to collect from "or sue" any one of several cardholders without giving up its rights against the others, which was included in the two superseded versions of the agreement under the heading "Joint and Several Liability."

## DISCUSSION

1. *California's Public Policy Favoring ADR Is Not Operative Unless the Parties Have First Entered Into an Enforceable Agreement to Arbitrate.*

The initial step in determining whether there is an enforceable ADR agreement between a bank and its customers involves applying ordinary state law principles that govern the formation and interpretation of contracts in order to ascertain whether the parties have agreed to some alternative form of dispute resolution. Under both federal and California state law, arbitration is a matter of contract between the parties. (*First Options of Chicago, Inc.* v. *Kaplan* (1995) 514 U.S. 938, 944-945 [115 S.Ct. 1920,

1924-1925, 131 L.Ed.2d 985]; see also *Mastrobuono* v. *Shearson Lehman Hutton, Inc.* (1995) 514 U.S. 52, 56-57, 62-63 [115 S.Ct. 1212, 1215-1216, 1218-1219, 131 L.Ed.2d 76]; *Moncharsh* v. *Heily & Blase* (1992) 3 Cal.4th 1, 8 [10 Cal.Rptr.2d 183, 832 P.2d 899].) As the United States Supreme Court has stated, "The 'liberal federal policy favoring arbitration agreements,' [citation] . . . is at bottom a policy guaranteeing the enforcement of private contractual arrangements." (*Mitsubishi Motors* v. *Soler Chrysler-Plymouth* (1985) 473 U.S. 614, 625 [105 S.Ct. 3346, 3353, 87 L.Ed.2d 444]; see also *Volt Info. Sciences* v. *Leland Stanford Jr. U.* (1989) 489 U.S. 468, 478 [109 S.Ct. 1248, 1255, 103 L.Ed.2d 488].) Similarly, the California Supreme Court has stated that, " '[T]he policy favoring arbitration cannot displace the necessity for a voluntary *agreement* to arbitrate.' " (*Victoria* v. *Superior Court* (1985) 40 Cal.3d 734, 739 [222 Cal.Rptr. 1, 710 P.2d 833], italics in original.) "Although '[t]he law favors contracts for arbitration of disputes between parties' [citation], ' "there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate . . . ." ' [Citations.]" (*Id.* at pp. 744; see also *Arista Films, Inc.* v. *Gilford Securities, Inc.* (1996) 43 Cal.App.4th 495, 501 [51 Cal.Rptr.2d 35]; *Chan* v. *Drexel Burnham Lambert, Inc.* (1986) 178 Cal.App.3d 632, 640 [223 Cal.Rptr. 838].)

A judicially ordered reference pursuant to Code of Civil Procedure section 638, the statute invoked in the Bank's bill stuffers, is also a matter of contract between parties. Section 638 provides for judicial reference only upon "the agreement of the parties filed with the clerk, or judge, or entered in the minutes or in the docket," or "upon the motion of a party to a written contract or lease which provides that any controversy arising therefrom shall be heard by a reference if the court finds a reference agreement exists between the parties."

In its statement of decision, the trial court asserted that California public policy favors arbitration and "embraces" judicial reference "since it is a long-standing statutory procedure," and implied that the need for consent with respect to such ADR procedures has been eroded since the California Supreme Court's decision in *Madden* v. *Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699 [131 Cal.Rptr. 882, 552 P.2d 1178]. Thus, the court stated that although it could not conclude from the evidence that, in general, the Bank's customers had read or understood the ADR clause, they would be bound by it because under *Madden*, as well as *Mormile* v. *Sinclair* (1994) 21 Cal.App.4th 1508 [26 Cal.Rptr.2d 725], *Michaelis* v. *Schori* (1993) 20 Cal.App.4th 133 [24 Cal.Rptr.2d 380], *Bolanos* v. *Khalatian* (1991) 231 Cal.App.3d 1586 [283 Cal.Rptr. 209], and *Hall* v. *Superior Court* (1993) 18 Cal.App.4th 427 [22 Cal.Rptr.2d 376], arbitration provisions have been

enforced against persons who have not read or signed them. These cases are inapposite and do not support the proposition that ADR can be imposed on a bank's customers without their consent.

In *Madden*, which did not involve a contract of adhesion (17 Cal.3d at pp. 711-712), the California Supreme Court held that the plaintiff, a state employee whose health care was covered by a Kaiser Foundation Health Plan (Kaiser) medical services contract, was bound by an arbitration provision in the contract even though she had not personally negotiated or signed it because the provision had been agreed upon by the Board of Administration of the State Employees Retirement System (the Board), which was authorized by statute to negotiate group medical plans as the agent for all state employees. (*Id.* at pp. 704-706.) The contract included a provision that allowed amendment by mutual agreement between the Board and Kaiser without the individual consent of the plan members. (*Ibid.*) Several years after the plaintiff enrolled in the health plan, the Board and Kaiser negotiated an amendment that required arbitration of all medical malpractice claims. Kaiser mailed a brochure describing the terms of the plan, including the new arbitration provision, to all members shortly before the contract was amended. (*Ibid.*) When the plaintiff was injured during surgery at a Kaiser hospital several months later, she argued that she was not bound by the provision because she had not received the brochure, was not aware of the arbitration amendment, and had no knowledge at the time of her operation that Kaiser required arbitration of malpractice claims. (*Id.* at pp. 704-705.) The Supreme Court rejected the plaintiff's argument on the ground that the Board was authorized by statute to act as the agent for all state employees, including the plaintiff, in negotiating group medical plan contracts. Thus, *Madden* does not stand for the proposition that consent is no longer required in order for an arbitration agreement to be valid. It simply means that one can be bound by consent given by one's agent, even if one is personally unaware of the provision. *Madden* is inapposite to the consent and contract formation issues that confront us in this case, since the account agreements here were not negotiated by someone else on behalf of the Bank's customers.

*Mormile* v. *Sinclair*, *supra*, 21 Cal.App.4th 1508, *Michaelis* v. *Schori*, *supra*, 20 Cal.App.4th 133, and *Bolanos* v. *Khalatian*, *supra*, 231 Cal.App.3d 1586 are similarly inapposite. All three cases involved arbitration agreements that complied with the requirements of the Medical Injury Compensation Reform Act set forth in Code of Civil Procedure section 1295, and in all three cases, the conclusion that a nonsigning third party was bound by the arbitration agreement rested in part on consideration of the public policies that led to enactment of that legislation (see, e.g., *Mormile*, *supra*, 21 Cal.App.4th at pp. 1511-1513), and in part on the existence of an agency or

quasi-agency relationship between the patient who had signed the agreement and the nonsigning third party—in *Mormile* and *Michaelis*, the patient's spouse, and in *Bolanos*, the father of the patient's baby. Moreover, as the *Mormile* court pointed out, protection of the patient's right to medical privacy also requires that third parties be bound by the agreement to arbitrate claims arising out of the treatment of the signatory patient. (21 Cal.App.4th at p. 1512.) Thus, the factors that led to the results in *Mormile*, *Michaelis* and *Bolanos* are not present here. These cases are simply not relevant to our consideration of the consent and contract formation issues raised by the Bank's attempt to add the ADR clause to the existing account agreements by sending its customers a bill stuffer.

Finally, *Hall* v. *Superior Court, supra,* 18 Cal.App.4th 427 offers even less support for the proposition that the consent requirement has been eroded since *Madden*. In *Hall*, a party who objected to an arbitration award on the ground that he had not signed the agreement had, in fact, stipulated to arbitration in court and participated in the arbitration without objection until he lost. In those circumstances, the court had no difficulty finding that he had, indeed, consented to arbitration even though he had not signed the agreement. (*Id.* at p. 436.)

When the trial court glossed over the threshold issue of consent and concluded that the validity of the Bank's modification of its account agreements depends on the manner in which ADR in general, and arbitration in particular, are viewed under California law, it put the cart before the horse. Whether there is an agreement to submit disputes to arbitration or reference does not turn on the existence of a public policy favoring ADR, as the trial court apparently believed. That policy, whose existence we readily acknowledge, does not even come into play unless it is first determined that the Bank's customers *agreed* to use some form of ADR to resolve disputes regarding their deposit and credit card accounts, and that determination, in turn, requires analysis of the account agreements in light of ordinary state law principles that govern the formation and interpretation of contracts. (See *First Options of Chicago, Inc.* v. *Kaplan, supra,* 514 U.S. at p. 944 [115 S.Ct. at p. 1924]; *Chan, Inc.* v. *Drexel Burnham Lambert, Inc., supra,* 178 Cal.App.3d at p. 637.)

*2. Whether the ADR Clause Became Part of the Account Agreements Depends Upon the Meaning and Scope of the Change of Terms Provision in the Original Account Agreements.*

Although the trial court characterized plaintiffs' action as a "facial challenge to the ADR Clause," the action is more appropriately described as a

challenge to the Bank's interpretation of the change of terms provision in the original account agreements. Whether the Bank's customers can be said to have agreed to allow the Bank to add the ADR clause to those agreements simply by sending them notice of the change depends, as a threshold matter, on the meaning and scope of the change of terms provision itself. Implicit in the Bank's interpretation of that provision is the assumption that adding the ADR clause is not really a modification at all because, by entering the original account agreements, the customers agreed ahead of time to be bound by any term the Bank might choose to impose in the future. The Bank argues that neither traditional contract offer-and-acceptance principles nor Civil Code section 1698's requirements of written consent or additional consideration apply if the modification is "in accordance with the terms of the contract."[6] (See *Busch* v. *Globe Industries* (1962) 200 Cal.App.2d 315, 320 [19 Cal.Rptr. 441].) The Bank appears to contend that regardless of the nature of a modification, the new ADR provision is a valid part of the contract as long as the prescribed procedure for making the modification was followed. In this case, the only procedural requirement set forth in the change of terms provision was that the Bank would notify the customer of the change. Thus, the Bank argues, because it sent notice in the form of the bill stuffer, it met the sole procedural requirement of the change of terms provision, and the modification was therefore valid because it was made "in accordance with the terms of the contract." We cannot agree.

The contract modification cases cited by the Bank and relied on by the trial court in its statement of decision do not support the proposition that a party with the unilateral right to modify a contract has carte blanche to make any kind of change whatsoever as long as a specified procedure is followed. In fact, those cases suggest that a modification made "in accordance with the terms of the contract" means, at least in part, a modification whose general subject matter was anticipated when the contract was entered into. For example, in *Busch* v. *Globe Industries, supra,* 200 Cal.App.2d 315, *Clark Equipment Co.* v. *Mastelotto, Inc.* (1978) 87 Cal.App.3d 88 [150 Cal.Rptr. 797], and *Powell* v. *Central Cal. Fed. Sav. & Loan Assn.* (1976) 59 Cal.App.3d 540 [130 Cal.Rptr. 635], the modifications in question were specifically identified in the original contracts as changes that might be made in the future under certain circumstances. (See also *Hunt* v. *Mahoney* (1947) 82 Cal.App.2d 540, 546 [187 P.2d 43] [extension of time to perform was not a modification requiring a writing because the possibility of an extension was provided for·in original contract].)

---

[6]Civil Code section 1698 provides in pertinent part: "A contract in writing may be modified by a contract in writing" (*id.,* subd. (a)); and, "[u]nless the contract otherwise expressly provides, a contract in writing may be modified by an oral agreement supported by new consideration" (*id.,* subd. (c)).

Similarly, the two cases cited by the Bank concerning amendment of bank bylaws, *Krupp* v. *Franklin Sav. Bank in City of New York* (1938) 255 A.D. 15 [5 N.Y.S.2d 365] and *State* v. *San Francisco Sav. etc. Soc.* (1924) 66 Cal.App. 53 [225 P. 309] (*San Francisco Sav. etc. Soc.*), also involved modifications pertaining to subjects addressed in original account agreements. In *Krupp*, a depositor agreed to be bound by the bank's bylaws and any amendments thereto. The bylaws in effect when the account was opened required presentation of the original passbook in order to make a withdrawal from the account. Twelve years later, the bank amended its bylaws to require the posting of an indemnity bond if the depositor requested the issuance of a new savings account passbook in the event the original had been lost or destroyed. The depositor, who wished to make a withdrawal after his passbook had been destroyed, contended that the bond requirement did not apply to him because it was not in the bylaws when he opened his account. The New York court concluded that the amendment was reasonable because a bond might be needed to protect the bank from double payment in the event an account had been assigned. The court also held that the new requirement was enforceable in view of the depositor's express agreement to be bound by amendments to the bylaws and the fact that the bond amendment had been adopted pursuant to a New York statute that expressly conferred on savings banks the right to establish the conditions upon which payments would be made in the case of lost passbooks. (*Krupp, supra,* 5 N.Y.S.2d at pp. 367-368.) Unlike the ADR modification here, the bond amendment did not impose a contract term concerning some matter not addressed in any way, shape or form in the original agreement, but was clearly related to a matter addressed in the original contract, namely, the requirement that the passbook be presented before a withdrawal could be made.

In *San Francisco Sav. etc. Soc.*, the State of California successfully challenged the enforceability of an amendment to a bank's bylaws, even though the original agreements with the bank's depositors provided that the bylaws could be amended without notice to the depositors or their consent. (66 Cal.App. at p. 56.) The original agreements provided that the bank would pay "dividends" (i.e., interest) on all deposits. (*Ibid.*) The amended bylaw stopped interest payments after an account had been dormant for 10 years. When certain dormant accounts escheated to the state, the bank refused to pay the interest that would have accrued but for the amendment. The court stated that where a depositor agrees that a bylaw may be amended without notice to him, the amendment is binding "in so far as such amendment may affect *only* those general rules and regulations, common to all banking and other corporations, which relate to the general administrative policies thereof." (*Id.* at p. 61, italics added.) Even a depositor's agreement

that the bylaws may be amended does not permit an amendment that would materially change the depositor's contract where the amendment is made without further notice to him, " '. . . and without his *consent.*' " (*Ibid.*, quoting 3 R.C.L. § 339, italics added.) It is notable that the bylaw amendment in the *San Francisco Sav. etc. Soc.* case, like the modifications in the cases discussed above, pertained to a matter expressly addressed in the original contracts, namely, the payment of interest. Nevertheless, that fact was not sufficient to assure the amendment's enforceability absent notice to the depositor and his *consent*, even though the original bylaws agreed to by the depositor expressly stated that no notice or consent were required.

In dictum, the court stated that, although the general rule seems to be that "where a person opens a deposit account with a bank the depositor is to be thereafter governed and bound by the by-laws existing at the time the account is opened," the rule is subject to the qualification that if, upon notice to the depositor, the bylaws are amended so as to materially change the original contract, deposits made after the amendment are held to be made under the contract so changed. (*San Francisco Sav. etc. Soc., supra,* 66 Cal.App. at p. 61.) Leaving aside questions about the adequacy of a bill stuffer as a notice, this dictum at first blush appears to support the Bank's contention that the bill stuffer was sufficient to bind the Bank's customers to the ADR requirement, at least with respect to transactions made after the bill stuffer was mailed. However, because the bylaw change in that case pertained to a matter that was already addressed in the original contract, i.e., payment of interest, we cannot assume that the court would have concluded that notice alone, without some affirmative evidence of the depositor's consent, could bind a depositor to a significant change regarding matters that were not addressed in the original contract at all.

The principal authority relied upon by the Bank and the trial court when it rejected plaintiffs' argument that the change of terms provision authorized only modifications of existing terms was *Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913 [216 Cal.Rptr. 345, 702 P.2d 503] (*Perdue*). The Bank contends that *Perdue* "unanimously approved the Bank's method for modifying its account agreement terms." It is mistaken.

In *Perdue*, the plaintiff filed a class action challenging the validity of charges imposed by Crocker National Bank for processing checks drawn on accounts with insufficient funds. Such checks were referred to as "NSF checks" and the charge for handling them was referred to as an "NSF charge." (38 Cal.3d at p. 920-923.) Crocker required each customer who opened a checking account to sign a "signature card," which was used to verify the authenticity of endorsements on checks. (*Id.* at p. 921.) The

signature card also stated that the undersigned depositors " 'agree with Crocker National Bank and with each other that . . . this account and all deposits therein shall be . . . subject to all applicable laws, to the Bank's present and future rules, regulations, practices and charges, and to its right of setoff for the obligations of any of us.' "[7] (*Ibid.*) The plaintiff alleged that the signature card was not a contract, or at least not a contract authorizing the unilateral imposition of NSF charges " 'in any particular sum or at all.' " (*Id.* at p. 922.) He argued that even if the signature card was a contract, it was illusory because it permitted Crocker "to set and change the NSF charges at its discretion, and without assent from the customer except such as may be inferred from the fact that the customer does not cancel his account after the bank posts notice of its rates." (*Id.* at p. 923, fn. omitted.) Citing the rule that " 'a contracting party's discretionary power to vary the price or other performance does not render the agreement illusory if the party's *actual* exercise of that power is reasonable' " (*ibid*; italics in original), the Supreme Court held that the signature card was a contract authorizing Crocker to impose NSF charges, "subject to the bank's duty of good faith and fair dealing in setting or varying such charges" (*id.* at p. 924).

The Bank contrasts the change of terms provision in the account agreements here with the language on the signature card in *Perdue*, arguing that the right to modify the account agreement there was not express but had to be inferred because, in the case of the signature card, "the only indication . . . that the terms of the agreement could be changed [was] the provision that the customer would be bound by 'present and *future* rules.' " (Italics added.) Thus, the Bank concludes that if the imposition or increase of NSF charges was valid in *Perdue*, then a fortiori its ADR clause is valid and enforceable because it was added to the account agreements pursuant to an express change of terms provision. In making this argument, the Bank fails to recognize that the *Perdue* signature card expressly addressed the imposition of both present and presumably different—i.e., "changed"—future charges. (*Perdue, supra*, 38 Cal.3d at p. 921.) Thus, the NSF fees objected to by the *Perdue* plaintiff clearly fell within the category of matters agreed to when he opened his account.

By suggesting, as the Bank does here, that the result in *Perdue* turned on the customer's agreement to be bound by "present and future *rules*" (italics added) rather than on his agreement to be bound by present and future *charges*, the Bank implies that *Perdue* authorizes financial institutions to add

---

[7]The Bank implies that this language was found in the "separate rules and regulations" that were incorporated into the signature card by reference. This is not correct. The quoted language was part of the signature card itself. (*Perdue, supra*, 38 Cal.3d at p. 921.)

entirely new terms or conditions to existing contracts with their customers, even if the new terms pertain to subject matters not addressed in the original account agreements. In fact, the *Perdue* court was not faced with having to determine the validity of that type of modification, or of a modification premised on a customer's agreement to be bound by the bank's present and future "rules" or "practices"—words that are arguably analogous to the word "terms" in the change of terms provision here. Rather, the *Perdue* court was simply required to determine whether NSF *charges* were authorized by the signature card. Since present and future *charges* were expressly listed among the matters Crocker's customers agreed to by signing the card, increasing the fee for NSF checks did not add a radically new and unanticipated term to the contracts between Crocker and its customers. Here, on the other hand, by sending out the bill stuffers, the Bank sought to add an entirely new *kind* of term to the original account agreements, which did not include any provision regarding the method or forum for resolving disputes. *Perdue* did not involve that type of modification and, contrary to the Bank's claim that the *Perdue* court "unanimously approved the Bank's method for modifying its account terms," the *Perdue* opinion sheds little direct light on the meaning and scope of the change of terms provision here.

*Perdue* does, however, underscore the importance of the duty imposed on one having the discretionary power to affect the rights of the other party to exercise that power in a manner consistent with the covenant of good faith and fair dealing. (*Perdue, supra,* 38 Cal.3d at p. 923.) Abuse of the power to specify terms is one of the judicially recognized types of bad faith. (Rest.2d., Contracts (1981) § 205, com. d, pp. 100-101.) While *Perdue* indicated that the bank's increase in NSF check fees was to be evaluated under the ". . . duty of good faith and fair dealing in setting or varying such charges" (38 Cal.3d at p. 924), other cases make it clear that the *exercise* of discretionary powers conferred on a party by contract must also be evaluated under the implied covenant to assure that the promises of the contract are effective and in accordance with the parties' legitimate expectations. (See *Carma Developers (Cal.), Inc.* v. *Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 371-372 [6 Cal.Rptr.2d 467, 826 P.2d 710]; *Cal. Lettuce Growers* v. *Union Sugar Co.* (1955) 45 Cal.2d 474, 484 [289 P.2d 785, 49 A.L.R.2d 496] [". . . where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing"].) Thus, the trial court's conclusion that the Bank's modification of the account agreements satisfied the covenant of good faith and fair dealing because "[t]he ADR clause does not operate to deprive the customer of expected or bargained-for benefits of his or her agreement" does not withstand scrutiny. The court's focus on the ADR clause, standing alone, was misplaced: It is the Bank's exercise of its

discretionary right to change the agreement, not the ADR clause in and of itself, which must first be analyzed in terms of the implied covenant. If the Bank's performance under the change of terms provision was not consonant with the duty of good faith and fair dealing, then whether the ADR clause, considered in isolation, satisfies the implied covenant makes no difference.

■ "The essence of the good faith covenant is objectively reasonable conduct." (*Lazar* v. *Hertz Corp.* (1983) 143 Cal.App.3d 128, 141 [191 Cal.Rptr. 849].) "[T]he covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive." (*Carma Developers (Cal.), Inc.* v. *Marathon Development California, Inc., supra,* 2 Cal.4th at p. 373.) One commentor has suggested that good faith performance of the discretionary power to affect the other party's rights requires the party holding such power to exercise it "for any purpose within the reasonable contemplation of the parties at the time of [contract] formation—to capture opportunities that were preserved upon entering the contract, interpreted objectively," and that, conversely, breach of the covenant occurs when the discretionary power is used to "recapture opportunities foregone" when the contract was entered into. (Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith* (1980) 94 Harv.L.Rev. 369, 373, fn. omitted, 387; *Carma Developers (Cal.), Inc.* v. *Marathon Development California, Inc., supra,* 2 Cal.4th at p. 372.) Where, as in this case, a party has the unilateral right to change the terms of a contract, it does not act in an "objectively reasonable" manner (*Lazar* v. *Hertz Corp., supra,* 143 Cal.App.3d at p. 141) when it attempts to "recapture" a forgone opportunity by adding an entirely new term which has no bearing on any subject, issue, right, or obligation addressed in the original contract and which was not within the reasonable contemplation of the parties when the contract was entered into. That is particularly true where the new term deprives the other party of the right to a jury trial and the right to select a judicial forum for dispute resolution.

■ Here, the Bank reserved to itself the unilateral and nonnegotiable right to vary every aspect of the performance required by the parties to the account agreements. The Bank's interpretation of how broadly it may exercise that right, with no limitation on the substantive nature of the changes it may make as long as it complies with the de minimis procedural requirement of "notice," virtually eliminates the good faith and fair dealing requirement from the Bank's relationship with its credit account customers, and is thus antithetical to *Perdue*, not consistent with it, as the Bank claims. In short, we conclude the trial court erred in deciding that the implied covenant of good faith and fair dealing had been satisfied by the Bank in its performance under the change of terms provision.

Moreover, permitting the Bank to exercise its unilateral rights under the change of terms provision, without any limitation on the substantive nature of the change permitted, would open the door to a claim that the agreements are illusory. ■ As a general rule, " '[a]n agreement that provides that the price to be paid, or other performance to be rendered, shall be left to the will and discretion of one of the parties is not enforceable. . . . But the fact that one of the parties reserves the power of varying the price or other performance is not fatal [i.e., does not render the contract illusory and unenforceable] if the exercise of this power is subject to prescribed or implied limitations, as that the variation must be in proportion to some objectively determined base or must be reasonable.' " (*Automatic Vending Co.* v. *Wisdom* (1960) 182 Cal.App.2d 354, 357 [6 Cal.Rptr. 31], quoting 1 Corbin on Contracts, § 98, p. 311; see also *Perdue, supra,* 38 Cal.3d at p. 923.) ■ Here, the "objectively determined base" which, in addition to the implied covenant of good faith and fair dealing, supplies an implied limitation on the change of term provision is the universe of terms included in the original agreements. As we will later conclude (*post,* pt. 3), the ADR provision is not in that universe.

Thus, we return to our starting point: What did the Bank's customers consent to when they agreed that the Bank could unilaterally change the terms of their account agreements? Plaintiffs contend that the change of terms provision did not authorize the addition of new terms, but only modification of what they refer to as the "price terms" of the credit account agreement, by which they mean the matters required to be disclosed under the Truth in Lending Act, 15 United States Code section 1601 et seq. When the trial court rejected this argument, it focused on construing the meaning of the word "change," rather than on construing the meaning of the word "terms." Citing Civil Code section 1644, which provides that, "[t]he words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning . . . ," the trial court ruled that the word "change" was equivalent to the word "amend," and included the concepts "add," "delete," "revise," "replace," or "modify." Not only does using the somewhat legalistic word "amend" to define the garden-variety word "change" appear to run counter to the spirit of section 1644, but the conclusion that "change" was intended to mean "add" is questionable in light of the fact that the phrase stating that the Bank could "add" new terms had been deleted from the revised version of the change of terms provision in the account agreements in effect when the ADR bill stuffer was mailed.

In any event, whether the change of terms provision permitted the Bank to add the ADR clause simply by sending a bill stuffer depends principally on what the parties intended by the word "terms," not on whether the word

"change" also means "add," or on whether the Bank used the word "add" in the change of terms provision. Yet the trial court made no serious attempt to ascertain the meaning attributed by the parties to the word "terms" as of the time the account agreements were entered into. (Civ. Code, § 1636.) Instead, it simply stated that "the word 'terms' is not, as plaintiffs argue, limited purely to price terms for already existing services," and that the Bank had the ability "to modify any of the relevant terms of the contract." But without a threshold determination of what the parties intended when they agreed that the Bank could change the "terms" of the account agreement, the validity of the ADR clause cannot be properly assessed. In order to make that determination, we must apply the standard statutory rules of contract interpretation in order to ascertain the mutual intention of the parties as it existed at the time the original account agreements were entered into. (See Civ. Code, §§ 1636, 1637; *Stevenson* v. *Oceanic Bank* (1990) 223 Cal.App.3d 306, 316 [272 Cal.Rptr. 757].)

*3. Application of the Standard Rules of Contract Interpretation Demonstrates That the Customers' Consent to Allow the Bank to Change the Terms of the Credit Account Agreement Did Not Constitute Consent to Addition of an ADR Clause by a Unilateral Notice.*

■ When a dispute arises over the meaning of contract language, the court must decide whether the language is "reasonably susceptible" to the interpretations urged by the parties. (*Oceanside 84, Ltd.* v. *Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1448 [66 Cal.Rptr.2d 487].) " '. . . Whether the contract is reasonably susceptible to a party's interpretation can be determined from the language of the contract itself [citation] or from extrinsic evidence of the parties' intent [citation].' " (*Ibid.*, quoting *Southern Cal. Edison Co.* v. *Superior Court* (1995) 37 Cal.App.4th 839, 848 [44 Cal.Rptr.2d 227].)

If the contract is capable of more than one reasonable interpretation, it is ambiguous (*Oceanside 84, Ltd.* v. *Fidelity Federal Bank, supra,* 56 Cal.App.4th at p. 1448; *Southern Cal. Edison Co.* v. *Superior Court, supra,* 37 Cal.App.4th p. 848), and it is the court's task to determine the ultimate construction to be placed on the ambiguous language by applying the standard rules of interpretation in order to give effect to the mutual intention of the parties (*Winet* v. *Price* (1992) 4 Cal.App.4th 1159, 1165 [6 Cal.Rptr.2d 554]). When ambiguities in a standardized contract, like the account agreement involved here, cannot be dispelled by application of the other rules of contract interpretation, they are resolved against the drafter. (Civ. Code, § 1654; *Oceanside 84, Ltd.* v. *Fidelity Federal Bank, supra,* 56 Cal.App.4th at p. 1448; *Powers* v. *Dickson, Carlson & Campillo* (1997) 54 Cal.App.4th 1102, 1112 [63 Cal.Rptr.2d 261].)

Interpretation of a contract is solely a question of law unless the interpretation turns upon the credibility of extrinsic evidence. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839]; *American President Lines, Ltd.* v. *Zolin* (1995) 38 Cal.App.4th 910, 923 [45 Cal.Rptr.2d 370]; *Stevenson* v. *Oceanic Bank, supra,* 223 Cal.App.3d at p. 315.) Even where extrinsic evidence is admitted to interpret a contract, unless it is conflicting and requires a determination of credibility, the reviewing court is not bound by the trial court's interpretation. (*Stevenson* v. *Oceanic Bank, supra,* at p. 315.)

 As noted, the Bank contends the change of terms provision authorizes any modification whatsoever, as long as the procedure set forth in the account agreements is followed, while plaintiffs contend there are substantive limitations on the kinds of changes authorized by the provision. We first address the language of the credit account agreement itself to determine whether it is reasonably susceptible to either or both of these competing interpretations.

Customers who opened a credit account with the Bank first encountered the change of terms provision in either the credit card application or the "Acceptance Certificate" included in a direct mail solicitation. The only "terms" actually set forth in these documents pertain to percentage rates for purchases, various fees, the method of computing balances, and the grace period. However, the application and acceptance certificate also indicated that by signing, the applicant agreed to be bound by the "terms and conditions of the agreement and disclosure statement" that would be sent to the applicant with his cards.

The credit account agreement and disclosure statements admitted into evidence at trial are all pamphlets about seven pages long. As we have pointed out, they set forth detailed information about purchases and cash advances, credit limits, finance charges, membership fees, late charges and other fees, calculation of balances and finance charges, payments, and the procedure for notifying the Bank of suspected errors on the bill as well as the Bank's obligations in the event a suspected error is reported. Also included in each agreement is a section headed "Other Important Information." It recites that the Bank does not have a security interest in purchases charged to the card or other property belonging to the customer, that the Bank requires the customer to sign the card upon receipt, that notices will be sent only to the first person listed on the account, that the customer must inform the Bank of changes in personal information and must report lost or stolen cards, that payment must be made in United States currency, that the customer may apply for credit insurance, that the Bank provides information

to outside merchants for promotional offers, that the Bank may obtain and release credit information regarding the customer, that the Bank may close an account at any time or suspend credit privileges, that the Bank does not waive its right to full payment by accepting checks or letters marked "payment in full," that customers' telephone conversations with the Bank may be monitored, that the agreement is covered by California law and applicable federal law, and also describes foreign currency transactions and what constitutes default. Also included, about two-thirds of the way into the "Other Important Terms" section, is the "Change of Terms" provision, which states that the Bank may change any "term, condition, service or feature" of a customer's credit account. Importantly, no "term, condition, service, or feature" in the original credit account agreement addressed the method or forum for resolving legal claims related to customer accounts.

Based solely on the language of the credit account agreement, we cannot conclude that either party's interpretation of the change of terms provision is clearly untenable. Although the Bank's interpretation is supported by the fact that the change of terms provision is broadly worded and contains no express limitation on its application, plaintiffs' narrower interpretation is supported by the fact that all the terms, conditions, services and features discussed in the original agreements pertain to matters that are integral to the Bank/creditor relationship, whereas the method and forum for dispute resolution—a matter which is collateral to that relationship—is not discussed at all.

Having determined that the credit account agreement is reasonably susceptible to the interpretations offered by both sides, we proceed to determine the construction of the ambiguous language by applying the appropriate canons of construction. ■ We ascertain the intent of the parties by considering an agreement as a whole, not by interpreting a provision in isolation. (See Civ. Code, § 1641; *Pinheiro* v. *County of Marin* (1976) 60 Cal.App.3d 323, 324-325 [131 Cal.Rptr. 633].) We may consider the circumstances under which an agreement was made, including its object, nature, and subject matter (Civ. Code, § 1647; *Western Camps, Inc.* v. *Riverway Ranch Enterprises* (1977) 70 Cal.App.3d 714, 723 [138 Cal.Rptr. 918]) and must be mindful of the rule that, "However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract" (Civ. Code, § 1648). We must also provide an interpretation that will make an agreement lawful, operative, definite, reasonable, and capable of being carried into effect, and must avoid an interpretation that would make it harsh, unjust or inequitable. (Civ. Code, § 1643; *City of El Cajon* v. *El Cajon Police Officers' Assn.* (1996) 49 Cal.App.4th 64, 71 [56 Cal.Rptr.2d 723].) We interpret the words used in an agreement

according to their ordinary and popular sense, unless the parties ascribed a special or technical meaning to them (Civ. Code, §§ 1644, 1645), and we also interpret any ambiguous language in the sense in which the promisor believed, at the time the agreements were entered into, that the promisee understood it (Civ. Code, § 1649). Finally, if the uncertainty is not removed by application of the other rules of interpretation, a contract must be interpreted most strongly against the party who prepared it. (Civ. Code, § 1654; *Jacobs* v. *Freeman* (1980) 104 Cal.App.3d 177, 189 [163 Cal.Rptr. 680].) This last rule is applied with particular force in the case of adhesion contracts. (See *Goddard* v. *South Bay Union High School Dist.* (1978) 79 Cal.App.3d 98, 106 [144 Cal.Rptr. 701].)

As discussed above, the change of terms provision is employed in the context of consumer credit agreements between the Bank and its customers. All the provisions of the original credit account agreements concerned matters that were integral to that relationship. In this context, there is nothing about the original terms that would have alerted a customer to the possibility that the Bank might one day in the future invoke the change of terms provision to add a clause that would allow it to *impose* ADR on the customer. We do not view the passing reference to "court costs" in the section headed "Other Bankcard Fees and Charges" or the statement that the contract is governed by California law, which implicitly includes the right to jury trial, as sufficient to put a customer on notice that the method and forum for dispute resolution are among the "terms" of the agreement that the Bank has the right to change. All this is not to say that the Bank could not have included an ADR clause in the original account agreement simply because such a provision is not integral to the financial relationship between the Bank and its credit account customers in the same way interest rates or finance charges are. But the validity of an ADR provision included in an account agreement in the first instance is a different issue, which we are not required to address here. Our focus is on whether the words of the original account agreements mean that the Bank's customers, by agreeing to a unilateral change of terms provision, intended to give the Bank the power in the future to terminate its customers' existing right to have disputes resolved in the civil justice system, including their constitutionally based right to a jury trial. In our view, the object, nature and subject matter of these agreements strongly support the conclusion that the customers did not so intend, and that they, as promisors with respect to the change of terms provision, had no inkling that the Bank understood the provision differently.[8] In short, the original agreements do not suggest that ADR was one of "those things concerning which . . . the parties intended to contract" (Civ. Code, § 1648).

---

[8]With respect to the change of terms provision, the customers agreed to allow the Bank to change terms in the future, but the Bank agreed to give the customers notice of

Although of dubious admissibility, the uncontradicted testimony of Sylvia Coats, a senior project manager in the marketing department of the Bank's credit card division, is consistent with plaintiffs' narrow interpretation of the change of terms provision, and provides little or no support for the Bank's position.[9] For example, when Ms. Coats was questioned about the meaning of the language "All terms are subject to change," as used in one of the Bank's credit card application forms, she initially testified that the word "terms" referred not only to the information set forth on the application itself, but also to the terms set forth in the cardmember agreement which the customer would receive later. When questioned further, however, she testified that "All terms are subject to change," as used in the application, referred only to the annual percentage rate, the variable rate index and spread, the annual membership fee, the grace period, and the charges for cash advances, service transactions, late payments, exceeding the account's credit limits, returned checks, and collection fees.

Ms. Coats also testified that the language "All terms are subject to change," as used in one of the Bank's direct mail solicitation forms dating from 1989, referred only to the annual membership fee, the annual percentage rate for purchases, variable rate information, the method for computing balances, the grace period, and transaction fees for cash advances, late charges, exceeding the credit limit and collection charges. Indeed, she testified that "All terms are subject to change" meant the terms set forth in the solicitation might have changed already, before an applicant signed the form, not that they were subject to further change after the form was signed.

Ms. Coats's testimony does not favor the Bank's broad interpretation of the change of terms provision. If anything, it suggests that the Bank itself attributed a narrow technical meaning to the word "terms" until it decided it wanted to add the ADR clause to the account agreements. Nothing about Ms. Coats's testimony persuades us that ADR was one of "those things concerning which it appears that the parties intended to contract." (Civ. Code,

---

the change. Therefore, as to that portion of the change of terms provision we are now interpreting, the customers were the promisors.

[9]Ms. Coats's testimony was received by the trial court without a parole evidence objection by either party, and on appeal the Bank does not contend that Ms. Coats was not competent to testify regarding the meaning of the contract language. "Although the intent of the parties determines the meaning of the contract (Civ. Code, §§ 1636, 1638), the relevant intent is 'objective'—that is, the objective intent as evidenced by the words of the instrument, not a party's subjective intent." (*Shaw* v. *Regents of University of California* (1997) 58 Cal.App.4th 44, 54-55 [67 Cal.Rptr.2d 850]; see also *Titan Group, Inc.* v. *Sonoma Valley County Sanitation Dist.* (1985) 164 Cal.App.3d 1122, 1127 [211 Cal.Rptr. 62] [Declaration of district's manager as to intent in including arbitration clause not relevant; "It is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation."].)

§ 1648.) The original credit account agreements are concerned with matters that are integral to the Bank/credit customer relationship, and do not address the collateral issue of how disputes are to be resolved. Certainly there is nothing in the original agreements to alert a customer that, by agreeing to allow the Bank to change the "terms," he or she might someday be deemed to have agreed to give up the right to a jury trial or to any judicial forum whatsoever. (See *Arista Films, Inc.* v. *Gilford Securities, Inc., supra,* 43 Cal.App.4th at p. 502.)

A narrow interpretation of the change of terms provision, which limits its operation to matters that are integral to the Bank/creditor relationship, does not render the provision inoperative or cause it to be mere surplusage. The Bank may still invoke it to modify fees, grace periods, annual percentage rates and so forth, subject to the Bank's duty of good faith and fair dealing. (See *Perdue, supra,* 38 Cal.3d at pp. 924-925.) It is not our purpose here to catalog all the matters that are integral to the Bank/creditor relationship and therefore subject to modification pursuant to the change of terms provision, but we do conclude that that imposition of an ADR provision like the one involved here is not one of them.

Thus, after analyzing the credit account agreements in light of the standard canons of contract interpretation, we conclude that when the account agreements were entered into, the parties did not intend that the change of terms provision should allow the Bank to add completely new terms such as an ADR clause simply by sending out a notice. Further, to the extent that application of these canons of construction has not removed all uncertainty concerning the meaning of the provision, we resort to the rule that ambiguous contract language must be interpreted most strongly against the party who prepared it (Civ. Code, § 1654), a rule that applies with particular force to the interpretation of contracts of adhesion, like the account agreements here.[10] (*Graham* v. *Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 819-820 [171 Cal.Rptr. 604, 623 P.2d 165]; *Goddard* v. *South Bay Union High School Dist., supra,* 79 Cal.App.3d at pp. 105-106.) Application of this rule strengthens our conviction that the parties did not intend that the change of terms provision should permit the Bank to add new contract terms that differ *in kind* from the terms and conditions included in the original agreements.

To reach the contrary conclusion, i.e., that the original account agreements *did* authorize addition of the ADR clause, we would have to assume that by agreeing to the change of terms provision, the Bank's customers intended to

---

[10]The Bank does not dispute the trial court's finding that its account agreements were contracts of adhesion. In fact, the Bank's former director of litigation admitted as much at trial.

permit a modification that would amount to waiver of their constitutionally based right to a jury trial (Cal. Const., art. I, § 16). ■ In order to be enforceable, a contractual waiver of the right to a jury trial "must be clearly apparent in the contract and its language must be unambiguous and unequivocal, leaving no room for doubt as to the intention of the parties." (*Trizec Properties, Inc.* v. *Superior Court* (1991) 229 Cal.App.3d 1616, 1619 [280 Cal.Rptr. 885].) Although an effective waiver, particularly in a nonadhesive contract, need not expressly state, "I waive my right to a jury trial" or words to that effect, it must clearly and unambiguously show that the party has agreed to resolve disputes in a forum *other than* the judicial one, which is the only forum in which disputes are resolved by juries. Thus the Supreme Court's decision in *Madden*, holding that arbitration agreements need not *expressly* waive the right to a jury trial, does not dispense with the need for a waiver; it merely dispenses with the need for a particular verbal formulation of the waiver. (17 Cal.3d at pp. 713-714.) As the *Madden* court said, "When parties agree to submit their disputes to arbitration they select a forum that is alternative to, and independent of, the judicial—a forum in which, as they well know, disputes are not resolved by juries." (*Id.* at p. 714.) In other words, waiver of the right to a jury trial is inherent in the decision to resolve disputes in a nonjudicial forum. But absent a clear agreement to submit disputes to arbitration or some other form of ADR, we cannot infer that that the right to a jury trial has been waived. As Division Five of this court stated in *Titan Group, Inc.* v. *Sonoma Valley County Sanitation Dist., supra,* 164 Cal.App.3d 1122, 1129: "In light of the importance of the jury trial in our system of jurisprudence, any waiver thereof should appear in clear and unmistakable form." Where it is doubtful whether a party has waived his or her constitutionally protected right to a jury trial, the question should be resolved in favor of preserving that right. (*Id.* at pp. 1127-1128; *Byram* v. *Superior Court* (1977) 74 Cal.App.3d 648, 654 [141 Cal.Rptr. 604].)

■ The Bank attempts to distinguish *Titan Group*, by claiming that, "While the [*Titan*] court noted *in dicta* that the arbitration agreement did not contain a clear and unmistakable waiver of a jury trial, that observation was not the basis for any conclusion or holding." (Italics in original.) This is not so. First, there was no "arbitration agreement," as the Bank refers to it, in *Titan*. Whether there was such an agreement was the sole issue in that case, and the court concluded there was not. There was, however, a contract which contained two provisions *pertaining to* arbitration. The first simply stated that any disputes between the parties could be resolved by arbitration *if the parties* " '*mutually agree[d].*' " (164 Cal.App.3d at p. 1125, italics in original.) The second stated that disputes " '*may* be' " subject to arbitration, and then described the procedures to be followed if arbitration were pursued.

(*Ibid.*, italics in original.) The court concluded that the first provision added nothing to the contract, since the parties could agree to arbitrate even without that clause. (*Id.* at p. 1128.) The party who was seeking to compel arbitration argued that in spite of its use of the word "may," the second provision must be interpreted as an agreement to arbitrate, or otherwise, like the first provision, it would be a nullity. (*Id.* at pp. 1128-1129.) The court disagreed, stating that the second provision served a contractual function because it described the procedures to be followed in the event the parties agreed to arbitrate. But because the statement that a dispute "may" be submitted to arbitration was not a waiver of the right to jury trial "in clear and unmistakable form," the court found no agreement to arbitrate in the contract. The *Titan* court's point was not that the *words* "waiver" or "jury trial" must appear in a contract before an agreement to arbitrate will be found, but rather that without such a waiver in some form that is clear and unmistakable, the court can find no agreement to arbitrate. Thus, the statement that any waiver of the right to jury trial must appear in clear and unmistakable form is not dictum, as the Bank claims. The *Titan* court's holding rests squarely on its failure to find such a waiver in the parties' use of the word "may" in the provisions that set forth the procedures to be followed *if* the parties chose to arbitrate.

We find no unambiguous and unequivocal waiver of the right to a jury trial either in the language of the change of terms provision or in any other part of the original account agreements. Nor do we find an unambiguous and unequivocal waiver in any customer's failure to close or stop using an account immediately after receiving the bill stuffers because, as even the trial court concluded, the notice contained in the bill stuffer was "not designed to achieve 'knowing consent'" to the ADR provision. The trial court stated that it could not conclude from the evidence presented at trial that customers had in fact read and understood the ADR clause, although it found the four individual plaintiffs had read it.[11] The court also noted that "[t]he explanation of the implications of the chosen ADR mechanisms could have been longer," yet inexplicably declared that a longer explanation would have been ineffective.

The wording of the bill stuffer itself is far from the direct, clear and unambiguous language required to alert a customer that by maintaining the status quo he or she is waiving an important constitutional right. For example, the conjunction of the conditional clause "If you or we request" with the mandatory language "any controversy with us will be decided" is potentially misleading. By stating that controversies will be decided by

---

[11]That finding comes as no surprise since they are the ones who have challenged the ADR provisions.

arbitration or reference "*If* you or we request" (italics added), the bill stuffer implies that ADR is more optional than it really is. Yes, the customer may opt for ADR, but if he or she does not wish to go that route, there is *no* choice in the matter if the Bank *does* wish to do so: In that case, controversies "will" be decided in an alternative forum. The initial emphasis of the bill stuffer on the supposedly optional nature of the provision tends to dilute the effect of the compulsory language that follows. Additionally, the bill stuffer says that arbitration or reference will "take the place" of a trial before a judge and jury. While this statement is literally accurate, it seems calculated to reduce the likelihood that customers will be alerted to the reality that the Bank, at its option, can take away the right to a judicial forum with its concomitant right to a jury trial.

The trial court was also apparently lulled by the benign tone of the bill stuffer: It said, "Since the substantive change described in the ADR Clause was to make available ADR mechanisms favored under California law, the notice was adequate." Of course, the bill stuffers did no such thing. Arbitration and reference were both "available" to the parties before the bill stuffers went out. What the bill stuffers were really intended to do was make it possible for the Bank to *impose* ADR procedures on its customers. While it is true that customers were given the equal opportunity to "impose" those procedures on the Bank, since the Bank favored them anyway, the customer's exercise of the option is not likely to be viewed by the Bank as an unwelcome turn of events. In short, the language of the bill stuffer, as well as the method used to disseminate it, suggests that it was designed to downplay the true significance of the Bank's ADR program, and to reduce the likelihood that customers would notice and object to the new provision.

We recognize that not every dispute concerning a deposit account or credit card account invariably implicates the right to a *jury* trial because in some instances only injunctive relief might be sought (see, e.g., *Brennan* v. *Superior Court* (1994) 30 Cal.App.4th 454, 457 [35 Cal.Rptr.2d 693]), or only the resolution of purely legal issues might be required (see, e.g., *Oceanside 84, Ltd.* v. *Fidelity Federal Bank, supra*, 56 Cal.App.4th at p. 1451). However, the Bank's interpretation of the change of terms provision would dispense with the requirement for a clear and unmistakable indication that the customer intended to waive the right to a jury trial. Because we find no unambiguous and unequivocal waiver of that right here, and because the right to select a *judicial* forum, whether a bench trial or a jury trial, as distinguished from arbitration or some other method of dispute resolution, is a substantial right not lightly to be deemed waived (*Arista Films, Inc.* v. *Gilford Securities, Inc., supra*, 43 Cal.App.4th at p. 502; *Chan* v. *Drexel Burnham Lambert, Inc., supra*, 178 Cal.App.3d at p. 643), the Bank's interpretation of the change of terms provision must be rejected.

## DISPOSITION

The judgment entered in favor of the Bank on the plaintiffs' third cause of action with respect to the validity and enforceability of the ADR clause is reversed. That clause is not a part of the Bank's contract with the four individual plaintiffs here and may not be enforced against them. The judgment is affirmed in all other respects. Costs are awarded to the individual appellants.

Corrigan, J., and Walker, J., concurred.

A petition for a rehearing was denied December 2, 1998, and respondent's petition for review by the Supreme Court was denied February 24, 1999. Baxter, J., and Chin, J., did not participate therein.