Filed 4/30/20

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SABRINA MAREZ,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>LYFT, INC.,<br><br>     Defendant and Respondent. | A156761<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-17-557889) |
| MARISSA CRUZ,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>LYFT, INC.,<br><br>     Defendant and Respondent. | A156765<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-17-558760) |

Jonathan Gaurano, driving a vehicle rented through defendant Lyft, Inc.'s (Lyft) "Express Drive program," struck plaintiffs Sabrina Marez's and Marissa Cruz's (plaintiffs) vehicles and caused significant injuries. The trial court rejected plaintiffs' argument that Lyft was liable under the doctrine of respondeat superior and granted Lyft's motion for summary judgment. Plaintiffs appeal from that judgment, arguing Gaurano had been acting within the scope of his employment with Lyft at the time of the accident. Plaintiffs further contend the trial court abused its discretion in limiting the

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.B.

scope of a person most qualified (PMQ) deposition. We disagree and affirm the judgment.

## I. BACKGROUND

**A.** *Lyft and the Express Drive Program*

Jonathan Gaurano started driving for Lyft in 2015. While he initially drove for Lyft using his personal vehicle, he began renting a vehicle from The Hertz Corporation (Hertz) through Lyft's Express Drive program.

The Express Drive program allows drivers to rent vehicles that are preapproved for use on the Lyft platform. The program provides certain incentives to drivers who use it. For example, it explains drivers may use the rental car for personal use, and the rental "include[s] unlimited mileage." Drivers can use multiple vehicles on the Lyft platform and can switch between the rental vehicle and any personal vehicle when driving for Lyft. The program also states "[i]nsurance and maintenance are always included in the rental cost." Specifically, the "Express Drive Insurance" provision states Lyft "provides primary Auto Liability coverage when you're logged into 'driver mode' in the Lyft app." When not logged into driver mode, the program states, "Hertz provides primary coverage" and the driver is "covered by Hertz'[s] Loss Damage Waiver," as set forth in the driver's rental agreement with Hertz. It also provides information on how to obtain maintenance and repairs for any rental.

The Express Drive program also imposes various conditions on drivers. For example, drivers must complete a minimum of 20 rides per week to renew the rental for another week. The program also prohibits drivers from "driv[ing] with any other rideshare companies in an Express Drive Rental," and requires drivers comply with Lyft's terms of service, maintain good

2

standing on the Lyft platform, and comply with the Hertz rental agreement and addendum.

Lyft, acting as an agent for Hertz, automatically deducts payment for the rental from the driver's weekly earnings. If those earnings do not cover the cost of the rental, Lyft charges the outstanding balance to the driver's credit card on file with Lyft. Lyft also provides a "Rental Rewards Program," which provides a bonus to drivers that covers some or all of the rental cost if they meet certain ride requirements.

Gaurano testified he used his rental car for both personal driving and for Lyft. He further testified he sometimes qualified for bonuses and, when he did not, he paid for the rental car.

## B. *The Accident*

On the day of the accident, Gaurano drove his rental vehicle into San Francisco to work at a gaming conference and parked at "a spot that I knew wouldn't get a ticket for that day." He then took a Lyft to the convention center where he would be working. Gaurano worked at the gaming conference for the entire day. He then took a rideshare back to his vehicle and proceeded to drive home. He planned to go straight home "and eat and sleep."

While driving home, Gaurano's vehicle collided with the plaintiffs' two vehicles. The police report identified Gaurano as the responsible party for the collision by driving at an "[u]nsafe [s]peed." Gaurano also had used his cell phone shortly before the accident in order to correspond with his brother and a friend.

## C. *Procedural History*

Plaintiffs filed separate complaints, both of which asserted Lyft and Gaurano were part of "a joint venture" and, accordingly, Lyft "shares liability

3

for any negligent acts" committed by Gaurano.  Plaintiff Marez filed a first amended complaint further alleging Lyft and Gaurano "combined their property, skill, or knowledge" in order to "carry out a single business undertaking," "had an ownership interest in the business," "had joint control over the business," and "agreed to share the profits and losses of the business."  The complaints were consolidated into a single action.

Lyft subsequently filed two motions for summary judgment or, alternatively, summary adjudication alleging plaintiffs could not establish Gaurano acted within the scope of the agency or in furtherance of the joint venture.[1]  Specifically, Lyft argued Gaurano had not used the Lyft platform on the day of the accident and thus could not have been acting as an agent for Lyft or a member of a joint venture when the accident occurred.  Lyft asserted mere use of a rental car through Lyft's Express Drive program did not create a 24-hour liability rule if that vehicle was used solely for personal purposes.

Plaintiffs filed separate oppositions.  Marez argued whether an employee was acting within the scope of employment is a question of fact.  She then raised four arguments for why liability must extend to Lyft.  First, Marez asserted Gaurano acted as Lyft's agent while in the rental car because Lyft controlled "so many aspects of his Express Drive rental."  Second, Marez contended Lyft was liable under respondeat superior because when a ride-sharing business gives a driver a car for the purpose of providing rides, a driving accident is an "intrinsic risk" of the business.  Third, Marez argued the "going and coming" rule did not apply because Gaurano's use of the rental car provided an " 'incidental benefit' " to Lyft, and Lyft encouraged drivers to

_____

[1] Lyft's motions for summary judgment appear to be identical apart from one being directed to plaintiff Cruz and one to plaintiff Marez.

4

use rentals for all of their personal driving. Finally, Marez asserted Gaurano and Lyft engaged in a joint venture to provide rides where both could either profit or lose money depending on how many rides Gaurano provided.

Plaintiff Cruz raised similar arguments in her opposition. She argued whether Gaurano was within the scope of his employment is a question of fact inappropriate for summary judgment. Specifically, Cruz argued the incidental benefit to Lyft by having Gaurano use the rental vehicle at all times made the "going and coming" rule inapplicable.

Lyft filed a reply, arguing the court could decide as a matter of law whether Gaurano acted within the scope of employment because the facts were undisputed. Here, asserted Lyft, the undisputed evidence showed Gaurano was not acting within the scope of employment at the time of the accident because he was not logged into the Lyft application and not engaged in any conduct that benefited Lyft. Nor was the "coming-and-going rule" applicable because Gaurano was not commuting to or from any worksite related to Lyft. Lyft further contended use of the Express Drive program did not alter the relationship between Lyft and Gaurano compared to a driver using his or her personal vehicle.

The trial court ruled in favor of Lyft on the "coming and going issues." However, it requested supplemental briefing on whether Gaurano "was always in the course and scope when he was in the [rental] car."

Plaintiffs subsequently filed supplemental oppositions. They argued Lyft's business model is to place more drivers on the road—for any reason—to increase the likelihood those drivers will log into the Lyft application. Plaintiffs contrasted drivers under the Express Drive program with other Lyft drivers because the Express Drive program requires drivers to provide a minimum number of riders per week and prohibits them from driving for

competitors when using the rental car.  Because of this exclusivity requirement, they argue, drivers provide a service to Lyft every time they drive regardless of whether they are logged into the application.  They further asserted increased accidents during driving were a foreseeable consequence of Lyft's business model.

Lyft also filed a supplemental brief, arguing plaintiffs failed to cite any new authority supporting their argument that Gaurano was always within the scope of employment when driving the rental car.  Lyft argued such a theory merely regurgitated plaintiffs' other arguments, which had been rejected by the trial court.

The court granted Lyft's motion.  The trial court found *Le Elder v. Rice* (1994) 21 Cal.App.4th 1604 (*Le Elder*) controlling.  It noted no authority supported plaintiffs' " 'the business is the car' " theory.  The court explained the issue was not whether Gaurano drove a company vehicle, but whether Gaurano was acting within the scope of any alleged employment, agency, or joint venture.  The court further held the "coming and going" rule was inapplicable because Gaurano had not been working for Lyft on the day of the accident, and, accordingly, it need not employ a " 'benefit to the employer' " analysis.  The court thus concluded Gaurano acted outside the scope of his relationship with Lyft and, as a matter of law, Lyft was not vicariously liable.  Plaintiffs timely appealed.

## II.  DISCUSSION

On appeal, plaintiffs contend the trial court erred in granting summary judgment because Gaurano was within the scope of his employment with Lyft at the time of the accident.  Plaintiffs also contend the trial court abused its

discretion in limiting the scope of a PMQ deposition.[2]  We address each
argument in turn.

## A. *Lyft's Motion for Summary Judgment*

### 1. *Standard of Review*

We review the trial court's decision to grant Lyft's motion for summary
judgment de novo.  (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163.)
Summary judgment must be granted if all the papers and affidavits
submitted, together with "all inferences reasonably deducible from the
evidence" and uncontradicted by other inferences or evidence, show "there is
no triable issue as to any material fact and that the moving party is entitled
to a judgment as a matter of law."  (Code Civ. Proc., § 437c, subd. (c).)  Where,
as here, the defendant is the moving party, he or she may meet the burden of
showing a cause of action has no merit by proving one or more elements of
the cause of action cannot be established.  (See *id.*, subd. (o)(1).)  Once the
defendant has met that burden, the burden shifts to the plaintiff to show the
existence of a triable issue of material fact as to that cause of action.  (*Hetzel
v. Hennessy Industries, Inc.* (2016) 247 Cal.App.4th 521, 524.)  We must
consider all evidence in the light most favorable to the nonmoving parties,
which in this case are the plaintiffs.  (*Aguilar v. Atlantic Richfield Co.* (2001)
25 Cal.4th 826, 843.)

### 2. *Respondeat Superior*

The Fifth Appellate District recently summarized the principles of
respondeat superior in *Moreno v. Visser Ranch, Inc.* (2018) 30 Cal.App.5th
568 (*Visser Ranch*): "The doctrine of respondeat superior holds an employer

---

[2] Plaintiffs also raise various arguments regarding the manner in
which Lyft asserted its objections to evidence and Lyft's response to
discrepancies in the evidence.  However, we need not address these issues
because the facts relevant to this appeal are undisputed.

liable for torts of its employees committed within the scope of their employment. (*Halliburton Energy Services, Inc. v. Department of Transportation* (2013) 220 Cal.App.4th 87, 93–94 (*Halliburton*); Rest.3d Agency, § 7.07, subd. (1); Rest.2d Agency, § 219, subd. (1); see Civ. Code, § 2338 ['principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency'].) A plaintiff suing an employer under the doctrine must prove the person who committed the tort was acting within the scope of his or her employment. (*Halliburton*, *supra*, at p. 94.)" (*Visser Ranch*, at pp. 575–576.)

*Visser Ranch* identified two tests California courts have used "for scope of employment under the respondeat superior doctrine." (*Visser Ranch*, *supra*, 30 Cal.App.5th at p. 576.) "Under one test, the employer is liable if the activities that caused the employee to become an instrument of danger to others were undertaken with the employer's permission and were of some benefit to the employer, or in the absence of proof of benefit, the activities constituted a customary incident of employment. (*Purton v. Marriott Internat., Inc.* (2013) 218 Cal.App.4th 499, 509 (*Purton*).)" (*Id.* at p. 577.) The second test, which was articulated in *Halliburton*, provides "an employee's conduct is within the scope of his or her employment if (1) the act performed was either required or incident to his duties or (2) the employee's misconduct could be reasonably foreseen by the employer in any event. (*Halliburton*, *supra*, 220 Cal.App.4th at p. 94.) In this test, foreseeability means that in the context of the particular enterprise, an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among the costs of the employer's business." (*Visser Ranch*, at p. 577.)

Apart from these two tests, California has also employed the " 'going and coming' rule" to determine whether an employee is acting within the scope of his or her employment when travelling to or from work. (*Visser Ranch*, *supra*, 30 Cal.App.5th at p.577.) "[T]his principle holds that an employee going to or from work ordinarily is considered outside the scope of employment and, therefore, the employer is not liable for torts committed during the commute." (*Ibid.*) " 'A well-known exception to the going-and-coming rule arises where the use of the car gives some incidental benefit to the employer.' " (*Lobo v. Tamco* (2010) 182 Cal.App.4th 297, 301, italics omitted (*Lobo*).)

### 3. *Analysis*

Plaintiffs do not identify which test should apply. Instead, they contend Lyft is subject to liability under both tests. Lyft also does not discuss these tests, and instead asserts the controlling rule is that " 'purely personal activities' " are outside the scope of employment. It argues we should follow *Le Elder*, *supra*, 21 Cal.App.4th 1604, in determining Gaurano's conduct at the time of the accident constituted a " 'purely personal activity.' "

Undoubtedly, courts have exempted "purely personal" conduct from the scope of employment. "Where an employee's activity does not come within the scope of employment, it is not part of the special employer-employee relationship. If an employee's act is purely personal, it is not 'typical of or broadly incidental to the employer's enterprise.' [Citation.] If the main purpose of the injury-producing activity 'was the pursuit of the employee's personal ends, the employer is not liable.' " (*Sunderland v. Lockheed Martin Aeronautical Systems Support Co.* (2005) 130 Cal.App.4th 1, 11 (*Sunderland*).) Courts have held "even if a prong of the scope of employment test described in [*Halliburton*] had been established, an exception to the test

9

existed for purely personal business." (*Visser Ranch*, *supra*, 30 Cal.App.5th at p. 583; see *Halliburton*, *supra*, 220 Cal.App.4th at p. 95.) However, no court has commented on how the "purely personal activity" rule interacts with the test outlined in *Purton*, *supra*, 218 Cal.App.4th 499.

### a. *Halliburton* Test and Purely Personal Activity

Plaintiffs contend the *Halliburton* test is met because (1) Lyft required drivers to drive the rental, (2) driving the rental was " 'incident to [Gaurano's] duties' " because he had to be in the rental to pick up rides, and (3) Lyft's encouragement of personal driving in the rental made accidents more likely. Plaintiffs further argue that while Gaurano may have been involved in a personal activity, it was not a *purely* personal activity because Lyft encouraged and financially incentivized personal driving in the rental vehicle. We disagree.

Nothing in the record demonstrates that Lyft required drivers to use Lyft rentals. Not only could Lyft drivers use their personal vehicles, but the Express Drive program expressly notes drivers with other Lyft-approved vehicles "can use both cars" and may "switch between multiple Lyft-approved vehicles."

Nor does the record support plaintiffs' claim that driving the rental for personal purposes, in this instance, was "incident to his duties." As noted above, *Halliburton* explained "a deviation from the employee's duties that is ' "so material or substantial as to amount to an entire departure" ' from those duties will take the employee's conduct out of the scope of employment." (*Halliburton*, *supra*, 220 Cal.App.4th at p. 95.)

We find *Halliburton*, *Le Elder*,[3] and *Sunderland* instructive in assessing whether Gaurano's conduct constituted a substantial departure from his duties to Lyft. In *Halliburton*, the employee was assigned a company pickup truck to drive and was informed he could "run errands and take care of business" between his shifts. (*Halliburton*, *supra*, 220 Cal.App.4th at p. 91.) After one of his shifts, he drove 140 miles to meet his family at a car dealership and have lunch with them. (*Id.* at p. 92.) On his return drive, the employee was involved in a car accident. (*Ibid.*) On appeal, the court found the employer was not liable. It explained, "The undisputed evidence indicated [the employee] was not performing his ordinary duties for Halliburton at its place of business or at his assigned worksite at the time of the accident. The accident occurred when he was between shifts, approximately 120 miles away from his assigned worksite." (*Id.* at p. 95.)

The court also declined to impose liability on the employer based on the "going and coming" rule. (*Halliburton*, *supra*, 220 Cal.App.4th at p. 105.) The plaintiffs argued "Halliburton benefited from [the employee's] use of the company truck for his commute to and from work, in order to invoke the

---

[3] Plaintiffs argue *Purton* and *Lobo* "effectively overruled" *Le Elder*, and *Le Elder* is based on an incorrect statement of law. However, neither *Purton* nor *Lobo* discuss *Le Elder*, let alone overrule its holding. Those cases also resolve distinct issues from *Le Elder*, which addressed whether an employee driving a company van for a personal purpose was within the scope of his employment. (See *Purton*, *supra*, 218 Cal.App.4th at pp. 509–510 [addressing proximate cause arising from a work-sponsored event]; *Lobo*, *supra*, 182 Cal.App.4th at p. 303 [addressing application of the required vehicle exception to the "going and coming" rule].) Nor do we find error in *Le Elder*'s analysis. It asked whether the employee's conduct was "incidental" to his employment—the same standard incorporated into both the *Purton* and *Halliburton* tests. (*Le Elder*, *supra*, 21 Cal.App.4th at p. 1607.)

incidental benefit exception to the going and coming rule and create a triable issue of fact regarding whether [the employee] was acting within the scope of his employment at the time of the accident." (*Id.* at p. 96.) The appellate court determined it need not reach that issue because, "[e]ven if the incidental benefit exception applied, Halliburton presented undisputed facts establishing that [the employee] was engaged in purely personal business at the time of the accident." (*Id.* at pp. 96–97.) The court noted the undisputed facts demonstrated the employee's purpose "was entirely personal," and he "was not performing any services or running any errands for Halliburton." (*Id.* at p. 102.)

Finally, the court rejected the plaintiffs' argument that such an accident was foreseeable because there was no "nexus between the employee's activity . . . and his employment." (*Halliburton*, *supra*, 220 Cal.App.4th at p. 104.) Specifically, the court emphasized, "The trip was a purely personal activity, unrelated to his employment duties. The tort was not engendered by, and did not arise from, [the employee's] work. The activity leading to the injury was not an outgrowth of [the employee's] employment; it was the result of [the employee's] pursuit of his personal interests. . . . [T]he fact that he used the company truck to accomplish it was insufficient to establish the required nexus between his activity at the time of the accident and his employment with Halliburton." (*Ibid.*)

Similarly, in *Le Elder*, an employee caused a car accident while returning home from dropping his children off at school. The employee intended to make a business call at home before driving to his office. (*Le Elder*, *supra*, 21 Cal.App.4th at pp. 1606–1607.) At the time of the accident, the employee scheduled his own working hours and locations but was required to be available 24 hours a day, 7 days a week. (*Id.* at p. 1607.) His

12

vehicle also was registered in a company plan that reimbursed for various vehicle maintenance costs and paid 6 cents per company-business mile provided the employee log at least 5,000 business miles annually and name the company as an additional insured on their automobile liability policy. (*Ibid.*) The trial court concluded the employer was not liable because the employee's activities in driving his children to school did not confer a benefit on the employer. (*Id.* at p. 1608.)

On appeal, the plaintiff argued " 'driving the van was typical, usual and inherent in the employer's enterprise, as [the employee] could not have performed his duties without it.' " (*Le Elder*, *supra*, 21 Cal.App.4th at p. 1608.) She further argued the employer derived a substantial benefit from the employee's driving because it allowed him to respond to calls at any hour from any location. (*Id.* at p. 1609.) The appellate court rejected these arguments, holding that the employee's trip to his children's school was a substantial personal deviation from his employment duties such that it would be unfair to hold the employer vicariously liable. (*Id.* at p. 1608.) The court emphasized the employee's purpose was "a purely personal activity." (*Ibid.*)

The appellate court also concluded the employer should not be liable under a totality-of-circumstances analysis. (*Le Elder*, *supra*, 21 Cal.App.4th at p. 1609.) It explained "a rule establishing 24-hour employer liability for on-call employees, regardless of the nature of the employee's activities at the time of an accident" would not further the aims of the respondeat superior doctrine. (*Id.* at pp. 1609–1610.)

Finally, in *Sunderland*, the employee worked as a field service representative for a subsidiary of Lockheed Martin Corporation (Lockheed) and was on assignment at Edwards Air Force Base. (*Sunderland*, *supra*, 130 Cal.App.4th at p. 6.) Lockheed "permits field representatives to use their

13

own vehicles for travel to field assignments, in part to enable them to have personal transportation while on a field assignment," reimburses for mileage driving to the field assignment, and provides a per diem allowance for food and incidental expenses. (*Id.* at p. 7.) During his assignment, the employee drove from his father-in-law's residence to a restaurant, where he was involved in a car accident. (*Ibid.*) He then returned to his apartment to eat. (*Ibid.*)

As relevant here, the Court of Appeal declined to impose liability on the employer, holding, "If an employee's act is purely personal, it is not 'typical of or broadly incidental to the employer's enterprise.' " (*Sunderland*, *supra*, 130 Cal.App.4th at p. 11.) The court explained at the time of the accident, the employee's "driving and activity was personal in nature and was not related to his employment or to his employer." (*Ibid.*) The court further emphasized "payment of a travel allowance . . . 'does not reflect a sufficient benefit to defendant [employer] so that it should bear responsibility for [a] plaintiff's injuries.' [Citations.] The benefit of an employee's activity to the employer's enterprise, and the employer's right to control that activity, are relevant factors in determining whether the activity comes within the scope of employment." (*Id.* at p. 12.) The court concluded the employee was not within the scope of his employment because he provided no services for Lockheed after leaving work, he drove to the restaurant for his own benefit, and Lockheed exercised "no control" over the employee's choice of transportation or movements at the time of the accident. (*Ibid.*)

The undisputed facts compel the conclusion, as a matter of law, that Gaurano had substantially deviated from any duties he performed for Lyft at the time of the accident. Gaurano had not worked for Lyft on the day of the accident and had no intention of doing so. In the morning, Gaurano parked

14

his vehicle at a location where he knew he would not receive a ticket for the day. He then travelled away from his vehicle and spent the day working for another employer. Lyft did not dictate how Gaurano should commute to this alternative job. It did not require Gaurano drive the rental vehicle or otherwise control his movements on the day in question. Nor was Gaurano's commute home from the gaming conference related to his driving for Lyft. Gaurano testified his sole intent at the time of the accident was to go home to eat and sleep. Based on these undisputed facts, we conclude Gaurano was engaged in a purely personal activity at the time of the accident.

For these same reasons, Gaurano's conduct was not foreseeable. "[T]here must be 'a nexus between the employee's tort and the employment to ensure that liability is properly placed upon the employer.' " (*Halliburton*, *supra*, 220 Cal.App.4th at p. 95.) Here, no connection exists between Gaurano's actions at the time of the accident—driving home after working at a gaming conference—and Lyft's business. The mere fact that Gaurano *could* have opted to drive for Lyft on the day in question instead of working at a gaming conference does not create such a nexus. There is simply no basis to impose vicarious liability where the employee's "entire trip serves only his or her own personal purposes." (*Id.* at p. 102.)

Plaintiffs argue Lyft's payment of certain expenses associated with Gaurano's personal driving encouraged him to use the rental vehicle for all his driving and created the risk of additional accidents. However, courts have rejected such an argument. In *Sunderland*, the employee was not within the scope of his employment despite his employer reimbursing for certain driving expenses. (*Sunderland*, *supra*, 130 Cal.App.4th at p. 12.) Similarly, in *Le Elder*, the employer reimbursed for various vehicle maintenance costs. (*Le Elder*, *supra*, 21 Cal.App.4th at p. 1607.) But those

15

benefits did not justify employer liability for all driving by the employee. Rather, the court assessed the nature and purpose of the trip and concluded the employee driving his children to school constituted a substantial personal deviation from his employment duties. (*Id.* at p. 1608; accord *Anderson v. Pacific Gas & Electric Co.* (1993) 14 Cal.App.4th 254, 256 ["payment of a travel allowance does not alter the general rule that an employee is not acting within the scope of employment while commuting to and from work"]; *Blackman v. Great American First Savings Bank* (1991) 233 Cal.App.3d 598, 603 [special errand exception did not apply to employee who, after work, was traveling to college classes funded by employer's educational assistance program].)

Nor is the fact that Gaurano had access to the vehicle through Lyft's Express Driver program determinative. Courts have long rejected imposing employer liability—even when employees are driving their *employer's* vehicle—if an employee is engaged in personal pursuits. For example, in *Slater v. Friedman* (1923) 62 Cal.App. 668, the plaintiff sustained personal injuries while riding as passenger in a taxicab. (*Id.* at p. 669.) The evidence indicated the driver of the taxi was authorized to work from 10:00 a.m. until 10:00 p.m., and the accident occurred at 11:45 p.m. (*Ibid.*) The court held the owner of the taxicab could not be held responsible because the driver was engaged in conduct for "purposes of his own." (*Id.* at p. 670.) The court explained if an employee performs an act while "pursuing his own ends exclusively," the employer cannot be held responsible "*even though the injury complained of could not have been committed without the facilities afforded to the* [*employee*] *by his relation to* [*the employer*]." (*Id.* at p. 672, italics added.) (See also *Kish v. California State Auto. Ass'n* (1922) 190 Cal. 246, 248 [same]; *Halliburton, supra*, 220 Cal.App.4th at p. 104 ["The activity leading to the

16

injury . . . was the result of [the employee's] pursuit of his personal interests. . . . [T]he fact that he used the company truck to accomplish it was insufficient to establish the required nexus between his activity at the time of the accident and his employment with Halliburton."]; accord *Williams v. U.S.* (N.D.Cal. 1956) 141 F.Supp. 851, 853 ["if an employee uses his employer's vehicle, not in furtherance of his employer's business, but for his own individual use, he is merely a borrower and the relationship of employer and employee not existing during the course of such use, the employer is not liable for his acts"].)

Finally, at oral argument plaintiffs' counsel asserted the exclusivity requirement of the Express Driver program—i.e., the requirement that drivers cannot drive for other rideshare companies in the rental vehicle— demonstrates a benefit to Lyft that brings any personal driving within the scope of Lyft's business. As noted above, Gaurano could have driven for other rideshare companies using his personal vehicle or another rental car. More importantly, however, the exclusivity provision preventing Gaurano from using the rental car to drive for other rideshare companies was of no benefit to Lyft on the day of the incident because Gaurano did not want to work as a rideshare driver for *any* company. Gaurano testified he did not, and never intended to, work as a rideshare driver on the day of the incident.

The cases on which plaintiffs rely do not compel a different result. In *Visser Ranch*, the plaintiff was injured in a car accident while riding home from a family gathering. (*Visser Ranch, supra*, 30 Cal.App.5th at p. 573.) The plaintiff asserted the driver's employer, Visser Ranch, was liable because the driver was acting in the scope of his employment. (*Id.* at p. 574.) While the trial court granted summary judgment, the appellate court reversed. (*Id.* at pp. 576, 584.) It concluded there was a triable issue of fact because the

17

driver was required to be " 'on call' " 24 hours a day, 7 days a week, was required to drive a vehicle provided by his employer "at all times," and was driving the plaintiff to begin a work shift. (*Id.* at pp. 573, 583.)

Here, conversely, we cannot conclude Lyft derived any benefit from Gaurano's use of the vehicle on the day in question. Lyft did not require drivers to use their rental vehicles for personal purposes. Lyft did not require drivers to be "on call" or otherwise available to Lyft or potential riders. Nor was driving to and from the gaming conference part of Gaurano's duties for Lyft. Indeed, the facts do not even indicate Gaurano contemplated driving for Lyft on the day of the incident. To the contrary, Gaurano testified he spent the entire day working at a conference, was away from his vehicle during the day, and was driving home to eat and sleep. Accordingly, there are no facts in the record to suggest Gaurano's use of the rental vehicle on that particular day increased the likelihood that Gaurano would have logged onto the Lyft application.

The other cases cited by plaintiffs are likewise distinguishable.[4] In *Purton*, an employee consumed alcohol at a work-related event, drove home without incident, but then struck another vehicle when he left his house to drive a coworker home. (*Purton*, *supra*, 218 Cal.App.4th at p. 502.) The court concluded "an employer may be found liable for its employee's torts as long as the proximate cause of the injury occurred within the scope of employment"—i.e., intoxication at a work event. (*Id.* at p. 508.) In *Yamaguchi v. Harnsmut* (2003) 106 Cal.App.4th 472, one employee attacked another employee, which resulted in injury to a third person attempting to

---

[4] Plaintiffs' reply brief cites *IBM Corp. v. Workers' Comp. Appeals Bd.* (1978) 77 Cal.App.3d 279. That case, however, is not applicable as it applies the "commercial traveler rule." (*Id.* at p. 282.)

quell the dispute. (*Id.* at p. 476.) The record indicated the employees had engaged in prior work-related disputes, and on one occasion the employee had threatened the other employee with a knife. (*Id.* at p. 482.) The court concluded a question of fact existed as to whether the attack and subsequent injury arose from a work-related dispute and were related to performance of his job duties, or whether the attack constituted a substantial deviation from those duties. (*Id.* at p. 485.) Unlike these cases, Gaurano's accident did not have any comparable connection to his duties for Lyft. The accident did not arise from an incident that occurred while he was driving for Lyft, and he was not engaged in risky conduct—such as drinking and driving—facilitated by Lyft.

Likewise, in *Lobo*, an employee was driving home from work when he struck and killed a deputy sheriff. (*Lobo*, *supra*, 182 Cal.App.4th at pp. 299, 302.) One of the employee's job requirements was, if necessary, to visit customer facilities. (*Id.* at pp. 301–302.) The employee testified he usually would visit customer facilities with a sales engineer and ride in the engineer's car, but on occasion, he would use his own car. (*Id.* at p. 302.) He had visited customer sites " 'very few' " times and used his own car fewer than 10 times. His supervisor testified the employee was required to use his personal car when it was necessary to visit customers and no company car was provided. (*Ibid.*) The Court of Appeal concluded a jury could find the required vehicle exception to the "going and coming" rule applied because the employer "required [the employee] to make his car available" and derived a "benefit of not having to provide him with a company car." (*Id.* at p. 303.)

Unlike in *Lobo*, the "going and coming" rule and any exception thereto is inapplicable because Gaurano was not returning home after driving for Lyft. Nor could any aspect of his day be considered a commute on behalf of

19

his driving for Lyft.[5]  Gaurano spent the day working for another employer. Moreover, Gaurano was not required to always use his Lyft-approved vehicle and was not required to drive it on the day of the accident.  "Courts have declined to apply the required vehicle exception when evidence showed the employee was not required to drive a personal vehicle to work on the date of the accident, even when the employee had used the vehicle for work purposes at other times."  (*Newland v. County of Los Angeles* (2018) 24 Cal.App.5th 676, 691.)

Undoubtedly, Lyft imposed conditions on the rental vehicle, such as exclusivity and a weekly ride minimum.[6]  But those conditions do not demonstrate that personal driving of the rental confers a benefit to Lyft. Rather, those conditions are more analogous to terms of employment. Plaintiffs acknowledge as much, conceding that exclusivity and control by

_____

[5] While plaintiffs briefly assert "the Lyft driver is always 'going and coming' from his use of the Lyft platform," they make no meaningful argument that this case falls within the scope of the "going and coming" rule and its exceptions.  Nor do they cite any authority to support their position. (See *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived."].)  Because the undisputed facts demonstrate Gaurano did not work for Lyft and did not intend to work for Lyft on the day in question, we find the "going and coming" rule inapplicable.

[6] Likewise, the benefits Lyft provided as part of the Express Drive program, such as unlimited personal mileage or insurance coverage, are benefits provided to drivers, not benefits drivers provide to Lyft.  Plaintiffs acknowledge "it is not any benefit to the employee that is the focus of course and scope of employment; *it is the benefit to the employer*."  While plaintiffs extensively discuss Lyft's representations about insurance coverage, that inquiry is not relevant to the analysis.  Any "risk" from insufficient coverage is not analogous to the drunk driving risk in *Purton* because lack of insurance was not the probable cause of the accident.  (*Purton*, *supra*, 218 Cal.App.4th at pp. 509–510.)

Lyft over the Express Drive program are "directed more to employment status than to course and scope of employment." And plaintiffs have not identified any condition, such as mandatory 24/7 availability, that could raise a factual question regarding whether Gaurano was operating within the scope of his employment. More generally, plaintiffs' argument is problematic because it presumes any Lyft driver (or, in fact, any ride-sharing driver) would be within the scope of his or her employment any time they drove an approved vehicle. According to plaintiffs, any time these drivers were in their vehicles, there would be an increased possibility they would log onto the ride-share application, particularly if there were any heightened financial incentives offered for doing so (increased fares, driving bonuses, etc.). And that possibility would constitute a benefit to Lyft and bring any driving, for any reason, at any time, within "the scope of business." We decline to create so broad a rule. (Cf. *Le Elder*, *supra*, 21 Cal.App.4th at pp. 1609–1610 [declining to create "a rule establishing 24-hour employer liability for on-call employees, regardless of the nature of the employee's activities at the time of an accident"].)

In so holding, we do not conclude that personal driving could *never* fall within the scope of employment. But under the undisputed facts presented here, we cannot conclude Gaurano's driving, at the time of the accident, could be interpreted as within the scope of his employment with Lyft.

### b. *Purton* Test

The alternative test promoted by plaintiffs, as set forth in *Purton*, *supra*, 218 Cal.App.4th at p. 509, requires a showing of both permission by, and benefit to, the employer. Plaintiffs contend Lyft gave permission for Gaurano to use the rental vehicle for personal driving, and such driving

benefited Lyft because it made Gaurano "available to log onto the Lyft platform."

Undoubtedly, Gaurano had permission from Lyft to use the rental vehicle for personal driving. The Express Drive program states as much. Accordingly, the question is whether the undisputed facts regarding the Express Drive program could be interpreted as conferring a benefit to Lyft.

For the reasons discussed in part II.A.3.a., *ante*, we conclude Lyft did not receive a benefit. Neither the fact that Lyft provided the vehicle through a program nor the fact that Lyft provided some degree of financial support for the vehicle brings Gaurano's driving within the scope of his employment. (See, e.g., *Halliburton, supra*, 220 Cal.App.4th at p. 104 [use of company truck insufficient "to establish the required nexus between his activity at the time of the accident and his employment with Halliburton"]; *Sunderland, supra*, 130 Cal.App.4th at p. 12 [travel allowance " 'does not reflect a sufficient benefit to defendant [employer] so that it should bear responsibility for [a] plaintiff's injuries' "].)

Nor are we willing to conclude any and all personal driving constitutes a "customary incident of employment." Cases finding personal activities to constitute a "customary incident of employment" have involved work-related perks, such as company parties (*Purton, supra*, 218 Cal.App.4th at pp. 502, 509) or access to an employer's golf course (*Winter v. Industrial Acci. Com.* (1954) 129 Cal.App.2d 174, 178). Personal driving is an often-necessary task performed by the majority of the population. People drive their children to school, go to the supermarket, and take weekend trips out of town. Concluding that all such driving necessarily falls within the scope of employment runs contrary to California authority.

The potential for Gaurano to log onto the Lyft platform, alone, is insufficient to bring all of his personal driving within the scope of his employment with Lyft. Gaurano testified he had not driven for Lyft on the day of the accident, and he had no intention of doing so. Rather, Gaurano worked the entire day for another employer. Based on these facts, Gaurano's driving at the time of the accident could not be interpreted as providing any potential benefit to Lyft or constitute a "customary incident of employment."[7] (See *Newland v. County of Los Angeles*, *supra*, 24 Cal.App.5th at p. 691.)

## B. *The PMQ Deposition*

The management of discovery, including the decision to issue a protective order, is ordinarily committed to the sound discretion of the trial court. (*Lipton v. Superior Court* (1996) 48 Cal.App.4th 1599, 1612; *Raymond Handling Concepts Corp. v. Superior Court* (1995) 39 Cal.App.4th 584, 588.) Such orders will not be reversed absent an abuse of that discretion. (*Raymond Handling Concepts*, at p. 588; *Lipton*, at p. 1612 [trial court's decision granting or denying discovery will be set aside only when there is " 'no legal justification' " for the order].) Where a party seeks review of a discovery order on appeal from a final judgment rather than pursuant to prejudgment writ, it must demonstrate not only that the order was error, but also that the error was prejudicial. In this context, prejudice means that it is reasonably probable that a more favorable result would have occurred had the issue been properly decided by the trial court. (*Lickter v. Lickter* (2010) 189 Cal.App.4th 712, 740.)

---

[7] As with the *Halliburton* test, we need not address whether off-platform driving under other circumstances may confer a benefit to Lyft. We limit our holdings to the specific facts of this case.

23

Plaintiffs contend the trial court abused its discretion when it limited the scope of the PMQ deposition to exclude "[t]he profitability or lack of profitability of the Express Drive program" and the "[r]isk analysis conducted prior to the implementation of the Express Drive program."

Because plaintiffs challenge the discovery order after judgment was entered, they must show the error was prejudicial. (*Lickter v. Lickter*, *supra*, 189 Cal.App.4th at p. 740.) Plaintiffs do not identify what specific information they were prevented from obtaining and how such information would have altered their ability to oppose Lyft's summary judgment motions. Moreover, plaintiffs concede evidence from Lyft's documents, Gaurano's testimony, and the PMQ testimony provided "sufficient facts" to show a benefit to Lyft and foreseeability. They instead argue the trial court improperly granted summary judgment because of an erroneous interpretation of the law, not because of a lack of evidence. Accordingly, plaintiffs fail to demonstrate that they would have obtained a more favorable result had the trial court not limited the PMQ deposition.[8]

## III. DISPOSITION

The judgment is affirmed. Lyft may recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

---

[8] Because we affirm the trial court's order granting summary judgment, we need not address plaintiffs' remaining arguments regarding the scope of discovery to which they would be entitled if summary judgment were reversed.

24

_____
Margulies, J.

We concur:


_____
Humes, P. J.


_____
Banke, J.

A156761, A156765
*Marez v. Lyft*

25

Trial Court:  Superior Court of the City and County of San Francisco

Trial Judge:  Harold E. Kahn

Counsel:

Galine, Frye, Fitting & Frangos, Ilya D. Frangos and E. Lynn Malchow for Plaintiffs and Appellants.

McGuireWoods, Matthew A. Fitzgerald, David S. Reidy and Syed D. Ali for Defendant and Respondent.